## GEO. REHFUSS ET AL. v. E. B. MOORE ET AL.

APPEAL BY PLAINTIFFS FROM THE COURT OF COMMON PLEAS
NO. 3 OF PHILADELPHIA COUNTY.

Argued April 3, 1890—Decided May 5, 1890.
[To be reported.]

1. A patent-right is such property as may be contributed to the capital of a limited partnership association under § 1, act of May 1, 1876, P. L. 89, and a description of the same in the recorded statement by the number, date and subject of the letters patent, and the name of the inventor, is sufficient.

Statement of Facts.

2. Distinct patents, covering different parts of or improvements in the same machine, and therefore considered valuable only in combination, may properly be valued together at a gross sum, in the schedule prescribed by said act of 1876, when so contributed by the same subscriber thereto.

3. When the schedule prescribed by the statute has been made and recorded in due form, the fact that the valuation therein placed on property subscribed is excessive, and even grossly so, will not render the members personally liable to creditors, if it was made in good faith: Sheble v. Strong, 128 Pa. 315, distinguished.

Before STERRETT, GREEN, CLARK, WILLIAMS and MITCHELL, JJ.

No. 176 January Term 1890, Sup. Ct.; court below, No. 420 March Term 1888, C. P. No. 3.

To the number and term in the court below, George Rehfuss and others, trading as George Rehfuss & Sons, brought assumpsit against Edward B. Moore and others, "copartners, trading as the Automatic Overseaming Button-hole Machine Company, Limited," to recover a balance alleged to be due from the defendants to the plaintiffs upon a contract for the manufacture of tools and machinery.

The contract set out in plaintiffs' statement of claim purported to be made by a limited partnership association, formed by the defendants under the name and title of the Automatic Overseaming Button-hole Machine Company, Limited, but the statement of claim averred that the defendants were liable thereon as copartners, for the reason that certain patent-rights contributed to the capital of the alleged association, as set forth in the schedule appended to the recorded certificate, were not property in the legal signification of that term, were practically worthless, and were knowingly and falsely valued at the sum of $496,970, and that the schedule was insufficient and the valuation a "lumping surmise." The defendants by affidavit of defence filed, denied these averments.

A rule for judgment for want of a sufficient affidavit of defence, after argument, was discharged by the court in an opinion by GORDON, J.

The defendants having pleaded non-assumpsit, the issue was tried on October 14, 1889, when the following facts were made to appear upon the part of the plaintiffs:

Statement of Facts.

On January 7, 1886, the defendants executed articles of association for the formation of a partnership association under the act of June 2, 1874, P. L. 271, and its supplements, articles third and fourth thereof being in the following form :

" Third. The total amount of capital and when and how to be paid is as follows :

" The capital of said partnership association is five hundred thousand dollars ($500,000), of which the sum of four hundred and ninety-six thousand six hundred and seventy dollars ($496,670) is now contributed by the said Charles R. Deacon in property at a valuation approved by all the members of the association subscribing to the capital thereof ; a schedule containing the name of the party contributing said property, with a description and valuation of the property so contributed, is as follows :

" Property contributed by Charles R. Deacon, as follows :

" Letters Patent of the United States, No. 286,989, for improvements in button-hole attachments for sewing-machines, dated October 23, 1883, granted to the Banks Button-hole Machine Company, Limited, assignee of Charles M. Banks.

" Letters Patent of the United States, No. 287,213, for improvements in button-hole sewing-machines, dated October 23, 1883, granted to the Banks Button-hole Machine Company, Limited, assignees of Charles M. Banks.

" Letters Patent of the United States, No. 305,657, for improvements in button-hole sewing-machines, dated September 23, 1884, granted to Charles M. Banks, and assigned to the Banks Button-hole Machine Company, Limited, October 12, 188 .

" Right, title and interest in three certain letters patent of the dominion of Canada, for the same inventions, patented in the United States by letters patent No. 286,989, dated October 23, 1883, No. 287,213, dated October 23, 1883, and No. 305,657, dated September 23, 1884, and Canadian letters patent having been granted, but not delivered, owing to models not having been supplied.

" And which letters patent, rights and interests are valued at the sum of four hundred and ninety-six thousand six hundred and seventy dollars ($496,670) by all the members of the association subscribing to the capital stock thereof. The balance

of said capital to wit: three thousand and thirty dollars ($3,030) has been paid in cash by the members contributing the same.

" The said capital is divided into and represented by one hundred thousand shares, of the par value of five dollars per share.

" Fourth. The nature and character of the business to be conducted is the manufacture and sale of machines, and the granting of licenses to manufacture, sell and use machines under said letters ; the purchase of letters patent, patent-rights, licenses and privileges for improvements in button-hole sewing-machines and attachments, and the manufacture and sale, and granting licenses to manufacture and sell and use machines under the same, and the conduct of general manufacturing of improvements and attachments to sewing-machines. The location of said association and its principal office to be in the city of Philadelphia."

By a supplemental instrument, executed on July 27, 1886, the valuation of $496,670 was amended so as to read $496,970, with an explanation that the sum named in the original statement was erroneously written in transcribing.

On July 27, 1886, the contract upon which this suit was brought was entered into between said association and the plaintiffs; the plaintiffs subsequently performed their part thereof, and there was due thereon to them the sum claimed by them.

Several of the defendants were called by the plaintiffs for cross-examination. Their testimony tended to show that the patents named in the schedule were of such a character that they were valuable only in connection one with another, all of them being required to cover the complete machine which the association proposed to manufacture ; that the precise amount of the valuation placed upon them was arrived at by deducting from the aggregate of the capital the contributions made in cash by the subscribers ; that for a one fifth interest in the patents the sum of $10,000 had been paid to the inventor, but at the time of executing the articles of association all the members believed, in view of the anticipated "earning capacity of the machine," that the patents were worth the amount of the valuation placed upon them, though some of the members had nothing to do with fixing a valuation, merely accepting that

placed upon them by others; that the machine covered by the patents lacked the close adjustment which would make it perfect, but it was expected to be perfected, and after the association commenced its manufacture, various experiments, alterations and improvements were made upon it; that subsequently, through the inventive activity of other men, patents for button-hole machines became common, and these particular patents, which were the pioneers in that direction, decreased greatly in value; and that in 1888, the association having become insolvent and been dissolved, the patents were sold at auction by the liquidating trustees and purchased by Edward B. Moore for $480. Portions of this testimony are quoted in the opinion of the Supreme Court, infra.

It was shown also that in contributing the patents, as a part of the capital, Charles R. Deacon was acting on behalf of others as well as himself, and that the interest in the association which, upon the face of the papers, was held by himself absolutely, was in fact held in trust for himself and others. There was evidence tending to show that the plaintiffs, at the time of making and performing the contract upon which their demand arose, had actual knowledge of all the facts relating to the patents and bearing upon their value.

At the close of the testimony for the plaintiffs, the court, REED, J., on motion of the defendants entered a judgment of compulsory nonsuit. Subsequently, after argument before the court in banc, a motion to take off the nonsuit was refused, GORDON, J., filing the following opinion:

The plaintiff here seeks to hold the defendants, who were members of a joint stock company, limited, individually liable as general partners upon the allegation of non-compliance with the statutes governing the formation of such companies. Of course there can be no doubt of the general doctrine that only by a full compliance with the provisions of law governing their formation can those composing such companies secure immunity from general liability. This case was first before us upon the plaintiff's rule for judgment. We then decided that patent-rights were personal property, and might be contributed to the capital of a limited company under the act of May 1, 1876, and that in the present case the recorded statement sufficiently

Opinion of Court below.

described the property: Rehfuss v. Moore, 46 Leg. Int. 26. The cause then went to trial upon the averment of known or arbitrary over-valuation of the property. The plaintiff's proof simply amounted to this: That the patent-rights were valued at $496,970, which was approved by all the members, who "considered" the property worth this sum; that one fifth of the rights cost the company $10,000, the remaining four fifths being contributed by one of the members, and that upon proceedings to wind up the company, at a sale made by trustees under an order of court, the patent-rights brought but $480. On this evidence the trial judge granted a nonsuit, and, we think, properly.

There is nothing in the act of 1876 which makes the members of a limited company warrantors of the property contributed. Indeed, the purpose of the act of 1876 is obviously to put upon those dealing with the company the responsibility of judging for themselves as to the actual value; in aid of which there is imposed upon the company the duty of a full and true description of the property, with a statement of the valuation given to it as capital by the members. If this is done in the recorded statement, everything is done that the act requires or that could be accomplished in the way of notice. Should the members be held to warrant their estimate of valuation contained in the recorded statement, instead of the act of assembly authorizing such companies giving reasonable confidence and security to business enterprise by limiting responsibility and securing public notice, it would add confusion and risk unprecedented and unexpected to millions of dollars invested upon a contrary faith, and bring disquietude to thousands of citizens. In the case before us, the patent-rights were needful for the business in which the company was to engage; they were minutely described in the publicly recorded statement; their valuation was truthfully stated as agreed upon, and it counts for nothing that subsequently, after eighteen months of trial, they were found not to justify the confidence of the members, and sold for a merely nominal sum. There was full compliance with the requirements of the act, and nothing to justify the allegation of fraud, or from which it might be inferred. The defendants were therefore entitled to the immunities of a limited company, and the nonsuit was properly entered.

Arguments.

—Thereupon the plaintiffs took this appeal, specifying that the court erred:

1. In refusing to take off the judgment of nonsuit.

*Mr. Joseph M. Pile*, for the appellants:

1. A patent is not such a piece of real or personal property as should take the place of money in the capital of a manufacturing concern, under the act of June 2, 1874, P. L. 271, and its supplement of May 1, 1876, P. L. 89. As the testimony shows, the value of a patent is uncertain, and shifts with the progress of mechanics from time to time. It is worth what it will earn. It was the expectation of perfecting the machine that made these patents valuable; but the machine was never perfected, earned nothing, brought bankruptcy on the company, and in less than two years sold for a thousandth part of the valuation placed upon it. It never had any value except for the purpose of wheedling people into buying the stock, and experimenting in the hope of striking something with real value.

2. The description of the patents in the schedule was too general. The act of May 1, 1876, P. L. 89, intended that the property contributed should be the equivalent of cash capital: Maloney v. Bruce, 94 Pa. 249. How can such a thing as this, which cost $10,000, was valued at $496,970, and sold for $480, all within a few months, be considered as having a cash value? Moreover, the patents should have been valued separately: Vanhorn v. Corcoran, 127 Pa. 255. It is not sufficient to give a description and a lumping valuation. But the patents were clearly put in at an over-valuation. It is not a question of good faith, nor is it a defence that creditors had actual notice: Sheble v. Strong, 128 Pa. 315; Andrews v. Schott, 10 Pa. 47. The testimony as to value was at least sufficient to require rebutting testimony, and if not entitled to a binding charge in our favor, we were at least entitled to go to the jury.

*Mr. John G. Johnson* (with him *Mr. William A. Manderson*), for the appellees:

1. Patents connected with the business of the association may be contributed as capital under the act of May 1, 1876, P. L. 89: Vanhorn v. Corcoran, 127 Pa. 255. The description gave as much information as would the setting out of the whole

of the letters patent; and, as the value of the several patents consisted in their combination in one ownership, it was impossible to give a separate valuation for each. Even if this were possible, we doubt whether the valuation would be defective, as in view of the particular description, " almost any business man could have formed a fair idea of their value: " See Vanhorn v. Corcoran, supra.

2. The plaintiffs have no right to attack the correctness of the valuation in any circumstances, or, at all events, except for fraud. Valuations are matters of opinion, and persons dealing with the association know this. If juries are to be allowed to turn these associations into general partnerships whenever they judge, in the light of subsequent events, that the valuation was exaggerated, the act of 1876 will be a horrible trap, and the question of limited liability will be not one of law, but one of fact, to be determined in each suit. Moreover, there is no evidence that the valuation in this case was excessive at the time it was made.

OPINION, MR. JUSTICE CLARK:

The act of June 2, 1874, P. L. 271, requires persons desiring to form a limited partnership or association to file with the recorder of deeds a statement in writing, duly signed and acknowledged, in which shall be set forth: The full names of the persons associated, with the amount of capital subscribed by each; the total amount of the capital, and when and how to be paid; the character of the business, and the location of the same; the name of the association, with the word "Limited" added thereto; the contemplated duration of the association, not exceeding twenty years; and the names of the officers selected in conformity with the provisions of the act. This act contemplated that the subscriptions to the capital should be payable in cash: Maloney v. Bruce, 94 Pa. 249; but by the supplemental act of May 1, 1876, P. L. 89, it was provided that it should be lawful " to make contributions to the capital thereof in real or personal estate, mines or other property, at a valuation to be approved by all the members subscribing to the capital of such association: provided, that in the statement, . . . . subscriptions to the capital, whether in cash or in property shall be certified in this respect according to the

Opinion of the Court.

fact; and, when property has been contributed as part of the capital, a schedule containing the names of the parties so contributing, with a description and valuation of the property so contributed, shall be inserted."

The Automatic Overseaming Button-hole Machine Company, Limited, was organized under the act of 1874, and its supplements; the statement filed is in due form, and sets forth in detail the various matters required. The capital is fixed at $500,000, of which $496,970 is contributed by Charles R. Deacon, "in property, at a valuation approved by all the members of the association subscribing to the capital thereof; a schedule containing the name of the party contributing said property, with a description and valuation of the property so contributed," being inserted, as follows:

"Property contributed by Charles R. Deacon, as follows:

"Letters patent of the United States No. 286,989, for improvements in button-hole attachments for sewing-machines, dated October 23, 1883, granted to the Banks Button-hole Machine Company, Limited, assignee of Charles M. Banks.

"Letters patent of the United States No. 287,213, for improvements in button-hole sewing-machines, dated October 23, 1883, granted to the Banks Button-hole Machine Company, Limited, assignee of Charles M. Banks.

"Letters patent of the United States No. 305,657, for improvements in button-hole sewing-machines, dated September 23, 1884, granted to Charles M. Banks, and assigned to the Banks Button-hole Machine Company, Limited, October 12, 188–.

"Right, title, and interest in three certain letters patent of the Dominion of Canada, for the same inventions, patented in the United States by letters patent No. 286,989, dated October 23, 1883, No. 287,213, dated October 23, 1883, and No. 305,657, dated September 23, 1884, and Canadian letters patent having been granted, but not delivered, owing to models not having been supplied.

"And which letters patent, rights, and interests are valued at the sum of four hundred and ninety-six thousand six hundred and seventy dollars ($496,670) by all the members of the association subscribing to the capital stock thereof. The balance of said capital, to wit, three thousand and thirty dollars ($3,030), has been paid in cash by the members contributing the same."

Opinion of the Court.

It will be observed that these letters patent are scheduled and described by giving their respective numbers in the patent office of the United States, the name of the inventor, the date of the patent, and its title. The Canadian letters patent "for the same inventions," not yet issued, were described for identification by their numbers in the United States patent office, and, as the right was not yet absolute, the schedule covered the right, title, and interest of the member contributing the same. No more complete, accurate, and definite description could have been made, as a reference to the several numbers in the patent office would disclose every particular respecting the nature of the patents and validity of the same. These inventions, moreover, were considered valuable only in combination; one of them, as we understand, covered the foundation principle of the invention, and the others were in aid of its practical operation. The patents, although distinct, were considered useful only as they united in the completion and operation of a single device embodying the principle of all three combined. In adjusting the valuation of these patents, therefore, they were properly considered and valued together. The contributor of these patents seems to have acted in trust for himself and others, but no question is raised as to that. But it is objected, first, that patent-rights are not " personal estate " or " property," within the meaning of the act of 1876 ; and, second, if they are, there was no proper valuation of these patents inserted in the schedule.

Property is corporeal or incorporeal ; one may be said, with equal propriety, to have property in a farm or a horse, or in an easement, a franchise, or in letters patent. A patent-right is the subject of assignment, sale, and inheritance. It may not, perhaps, be liable to a sale on a common-law execution, as it has no visible and tangible existence, and is a species of property which is incapable of manual seizure ; but the highest courts in New York and California have affirmed the power upon a creditors' bill to order the assignment and sale of a patent-right for the payment of the patentee's judgment debts: See Gillett v. Bate, 86 N. Y. 87 ; Pacific Bank v. Robinson, 57 Cal. 520 ; and the same power was sustained in Ager v. Murray, 21 Amer. Law Reg., N. S., 469, [105 U. S. 126?] in the Supreme Court of the United States, where Mr. Justice GRAY,

in delivering the opinion of the court, said : " A patent or a copyright, which vests the sole and exclusive right of making, using, and vending an invention, or of publishing and selling a book, in the person to whom it has been granted by the government, as against all persons not deriving title through him, is property, capable of being assigned by him at his pleasure, although his assignment, unless recorded in the proper office, is void against subsequent purchasers or mortgagees for a valuable consideration without notice."    In England, it has long been held that a patent-right would pass by assignment in bankruptcy, even without express words to that effect in the bankrupt act: Hesse v. Stevenson, 3 B. & P. 565.    See, also, Curtis on Pat., § 174, and Ager v. Murray, supra, and cases there cited.    We think there can be no question that a patent-right is such property as may be contributed to the capital of a limited partnership association, within the meaning of the act of 1876.    All property thus contributed is to go into the capital " at a valuation to be approved by all the members subscribing to the capital," and the valuation so made is to be inserted in the statement.    In Maloney v. Bruce, 94 Pa. 249, it was held that, if parties seek to have all the advantages of a partnership, and yet limit their liability to creditors, they must comply strictly with the act of June 2, 1874.    The object of the act of May 1, 1876, requiring a schedule of the property contributed, it was said was to enable creditors to ascertain precisely of what the property consists, and to judge of its value, and that where property has not been scheduled and valued there is no payment of the capital.    In that case, the property contributed was a " contract with the Pennsylvania Gas-Light Company, at the valuation of $2,500 ; merchandise, consisting of iron, steel, tin, and copper wire, gas-pipes ; . . . . . all the goods, tools, and chattels now on the premises, 209 Lackawanna avenue, Scranton City," etc.    " This," says the court in that case, " is not the kind of schedule contemplated by the act of 1876.    The description is too general to enable any one to form a correct estimate of the extent of the property, and the lumping valuation renders it equally difficult to judge of the values.    The property contributed was intended as the equivalent of the cash capital, and the plain object of the provision in the act of 1876, requiring a schedule, was to enable

creditors to ascertain precisely of what the property consisted, and to judge of its value." In Vanhorn v. Corcoran, 127 Pa. 255, we held that, where property is contributed, it must be property valuable for the business of the company, and for the payment of its creditors, and the certificate must set forth in its statement such a description of the property contributed as will " enable creditors to ascertain precisely of what the property consisted, and to judge of its value." In that case, the statement showed a subscription of property, " paid in merchandise, lumber, book-accounts, and bills receivable, transferred to this association, $21,609.18; and in cash, $3,390.82; making a total subscription, $25,000." It appeared that the $21,609.18 represented the difference between the estimated assets and liabilities of the firm subscribing to the capital of the association, and if the statement had certified, in this respect, correctly, " according to the fact," the organization would have been defective; and the certificate was held to be insufficient. In Sheble v. Strong, 128 Pa. 315, the subscription was of " machinery to be valued and accepted," but there was no schedule, and it was held that the recorded statement must show a schedule, with a detailed description and valuation of the machinery, as required by the act of 1876, otherwise the members will be held as general partners. " The question," says our Brother STERRETT, in delivering the opinion of the court, " is not one of good faith on the part of the defendants, or of notice to the creditors, but whether, in their attempt to form a limited partnership, they conformed to the law; if they did not, their attempt was abortive, and it is no difference that creditors had actual knowledge of the facts required to be set out in the recorded statement."

But where, as here, the statement is in due form, and contains all the essential requirements of the statute, but the valuation is alleged to be unconscionable, and inserted in the statement without any proper consideration of the inherent or intrinsic worth of the property contributed, the question is one of good faith. All property contributed under the act of 1876 is to go into the capital " at the valuation to be approved by all the members subscribing to the capital," and the subscribers would not be justified, perhaps, in fixing à grossly fictitious and fraudulent valuation to mislead and defraud creditors,

Opinion of the Court.

But if their estimate is made honestly and in good faith, it must be accepted, although mistaken, and even grossly excessive. Their motives must be considered as of the time when the valuation was made; it will not do to condemn their estimate of the property because it afterwards proved worthless, and the enterprise resulted in a disastrous failure. In this case there is no evidence of fraud. The members of the association seem to have believed these patents to have been of extremely great value. One fifth interest in the original invention cost $10,000; the remaining four fifths were held by Mintzer and Banks, and the entire patent was thus contributed to the association.

The design of the association was to manufacture extensively a device attachable to the ordinary sewing-machine, for working button-holes, which, it was believed, would come into universal use, not only for factory, but for family uses. Banks's invention worked the button-hole, but did not cut the cloth; a cutter attachment was afterwards perfected and turned in to the association, and then the device not only cut the cloth, but worked the button-hole in a very perfect manner. When this device was attached to the sewing-machine, however, the needle had to be lengthened, and the operation of the machine was impaired somewhat from the vibration of the needle. Maj. Moore was asked: "What were those patents worth at that time, independent of your patent and your improvements? A. That is a very indefinite question; no man can tell the value of a patent until it is tried. Mr. Banks's patent involved what I regarded as of very great value,—a slide that moves straight forward, stops, a disc turns and moves that again in the same direction,—a thing that had never been done before, and for which he holds the bottom patent. That I regarded as very valuable." "Q. Did you ever have an idea yourself that those patents were worth any such sum of money? A. Yes, sir; I did. If you want to know the reason, I will tell you. Q. I would like to have it. A. A patent, as I said, is worth just what it will be able to earn. That patent, which was the ground-floor patent, contemplated in its construction of going into every household in this country, if it could have been made to do it; and I believed at the time it could have been done; and when you contemplate what a country this is, and

Opinion of the Court.

other countries besides, if you could produce a machine of that kind, by which a woman could change, and by removing four screws, make her button-holes, then change it back into a plain sewing-machine, we thought that would be a very valuable patent. Mr. Rehfuss tried it years before. It was the making of the American Sewing-Machine Company, and we believed it was valuable. Otherwise we would not have stepped up and put down our money. Q. The reason why you believed those patents were worth that enormous sum of money was because you expected in the future to perfect that improvement, and to put, as you say, the machine in every house in the country? A. We did. Q. It was the expectation of being able to do that, that made the patents, in your judgment, valuable? A. Yes, sir. It is the earning capacity of that machine that made it valuable. I have never sold a share of stock in that company, from the time it was organized under Banks up to the present time, and I think I have $20,000 in it. That shows what my faith has been in it. I never offered a share of stock for sale. No man ever bought a share of stock from me, and I am still spending money on it. Q. You are the proprietor of the patents now? A. Yes, sir; and I have still the same faith I had before. I want to say, further, with reference to these patents, what my experience has been. The earning capacity of a patent, if you can get it right, is very great. The first button-hole machine that I was in was not a success, although a contract was made with the Singer Company to put it on all their machines. That company transferred the principle it had in that button-hole machine into a company. The device on it does not cost $10, and yet it has been earning the interest of a million dollars. We went out of that company, and organized another company, for which we paid $2,000, three of us, and four of us went into it, and organized a company on the basis of $50,000. I have taken out of that in the last four years about $12,000. It is not what you think a thing is worth, to look at it; it is what you think it will earn. You would not give me a five cent piece for that to look at it. That cost ten dollars to put on a sewing-machine; yet, I tell you, that under the control of two companies, a combination was formed to put that on a sewing-machine, and yet it has earned the interest of a million dollars. I do not know whether it has not

.Opinion of the Court.

paid more than that,—two million dollars; because, on one side, I cannot tell how much they get. The other side has paid ten per cent on $800,000. That patent did not cost ten dollars to make. Q. Then you got together with those other gentlemen, Mr. Long, Mr. Gray, Mr. Shipley, Mr. Deacon and Mr. Williamson, and signed an agreement, agreeing that that patent was worth $496,970? A. We did. Q. How did you get just that amount of money? How did you fix that? A. I do not know how it was done. The original value was fixed by Dr. Mintzer and Banks, and we accepted the situation as they made it."

This testimony illustrates the great degree of confidence which the members of the association had in the success of their enterprise, and of the value of these patents. It appears that the same patents had previously been put into what was known as the Banks Button-hole Machine Company at the valuation of $500,000. This valuation was made by Dr. Mintzer and Charles M. Banks, the owners of the patents. That company, whilst endeavoring to perfect the action of this device, had some differences to arise between its members, and went into liquidation, and the reorganization was effected under the name of the Automatic Overseaming Button-hole Company, Limited, the patents being put in at the same price, less the amount of cash contributed.

Dr. Mintzer testifies that when Banks sold his patents the device worked quite satisfactorily. He says: " We most clearly defined satisfactorily a principle, but oftentimes it wants close adjustment before it will do practical work. Such was the position when Mr. Banks sold his patents." He says, further, that he regarded the Banks patent as involving an exceedingly valuable principle, out of which he expected a very large sum of money would be realized; that their counsel was Mr. Connolly, a patent lawyer of very large experience, and, in fixing the valuation, he deferred to the opinion of his counsel, but he joined in the certificate, believing that it was all right and proper. Mr. Deacon testifies that the members of the association agreed to accept the valuation that had been placed upon the patents in the old company; that the capital was $500,000, and they decided to deduct the cash contributed, and the balance was agreed upon as the value of the patents.

Syllabus.

He says : "I believed the patents to be very valuable. I had considerable experience in the sewing-machine business, and I thought it was the best button-hole I had seen, and on the strength of it I invested the money in the old company." Charles B. Lee says he thought the patents were worth the amount of their valuation, or he would not have signed the papers or paid his money.

The case depends upon this testimony; there is practically nothing to support a charge of fraud. The testimony clearly shows that this enterprise was undertaken in good faith, and that the members had the utmost confidence in its final success. They paid in the cash capital, and contributed as much more in aid of the enterprise. The whole trouble was, that, although the invention was valuable in mechanical conception, and was a pioneer invention in its line, yet others, who were active in the same direction, relieved its imperfections, and reaped the reward. The plaintiffs were not deceived. They knew the nature and character of the several contributions made to the association, for these contributions were certified upon the record according to the fact, and they had, besides, actual, personal, and intimate knowledge of the resources of the company. We are of opinion that this was a good-faith transaction, and the judgment should be affirmed.

Judgment affirmed.