MOORE *v.* UNIVERSAL ELEVATOR CO.[1]

1. CORPORATIONS—MORTGAGE TO STOCKHOLDER—RIGHTS OF BONUS SUBSCRIBERS—EVIDENCE.

In a controversy between subscribers to a bonus fund for a corporation and a stockholder to whom the corporate property has been deeded to secure him for advances, the conditions of a private arrangement under which the mortgagee became a stockholder are immaterial.

2. SAME—CAPITAL STOCK—GOOD FAITH OF SUBSCRIPTIONS.

Subscribers to a bonus fund for a corporation have a right to assume that the subscriptions to its capital stock were made in good faith, and that they will be paid in money or in money's worth.

3. SAME — OVER-VALUATION OF PROPERTY — NEGLIGENCE OF DIRECTOR.

Where a director in a corporation, who, though not a *bona fide* stockholder, is held out as such, neglects to examine into the value of property turned over to it in payment of stock subscriptions, and such property proves to be worthless, as between him and those who subscribed to a bonus on the faith of his connection with the corporation, he must be the loser, and he cannot defend upon the ground that he was not an actual stockholder.

4. SAME—MORTGAGE DEED.

A deed from a corporation, absolute on its face, but given to secure advances made by a director, is a mortgage, and the corporation may convey the property in payment of its debts, subject to such mortgage, if valid.

5. SAME—CLAIMS OF BONUS SUBSCRIBERS—BREACH OF CONTRACT.

Where corporators, having agreed, in consideration of a bonus subscription, that a stated amount of the capital stock should be immediately subscribed, that a building should be erected and equipped for manufacturing, and that the business should be in active operation within a stated time, procured no *bona fide* subscriptions to the capital stock, but, in lieu thereof, turned in property at a grossly excessive valuation, equipped

---

[1] Rehearing denied April 3, 1900.

the building erected by them with machinery the title to which was retained in the vendors, and failed entirely to put the business into active operation, they were not justified in resisting the claims of the bonus subscribers upon the ground that their subscriptions were not paid in full.

6. SAME—FAILURE OF BUSINESS—STATUTES.

The fact that a corporation just organized secures a director for advances by a deed to its property, and also gives a deed to the same premises to secure the bonus givers, before it has fairly commenced the business for which it was organized, does not constitute the failure in business contemplated by Act No. 144, Pub. Acts 1895, § 6, providing that, in case of the failure of a corporation, bonus givers shall become creditors to the amount contributed.

7. SAME—PRIORITY OF LIENS—FRAUD.

The lien of a director of a corporation under a mortgage given by it to secure him for advances will be held inferior to that of bonus givers, claiming under a trust deed of the same property, where the bonus subscriptions were induced by fraudulent representations concerning the capital stock, for which representations the director, even if ignorant of the fraud, was, under the circumstances of the case, responsible.

8. SAME—REMEDY—EQUITY JURISDICTION.

It is not necessary for a defrauded subscriber to a bonus fund, having possession of the corporation's property under a deed executed to secure him, to exhaust his claim against the corporation by suit, judgment, and execution returned *nulla bona*, where he is a party defendant to a suit by a director to foreclose an alleged prior lien, all parties interested being before the court.

Appeal from Wayne; Daboll, J., presiding.   Submitted October 3, 1899.   Decided December 2, 1899.

Bill by Charles W. Moore against the Universal Elevator Company, Frank E. and James N. Schoonmaker, William Livingstone, Jr., and others, to determine the priority of liens. From the decree rendered, the above-named defendants appeal.   Reversed.

In the summer of 1895 the defendants Frank and James Schoonmaker and Hultgren were copartners, doing busi-

ness under the firm name of Schoonmaker Bros. & Co. Their business was that of selling engines and elevators and general lines of machines. They owned no property except some interests in certain elevator patents. They sold machinery for other parties, chiefly, if not wholly, as agents for the Otto Gas-Engine Works and the Morse-Williams Elevator Company. None of the partners were of any financial responsibility.. In July of that year they conceived the scheme of organizing a corporation for the manufacture of elevators under the interests in the patents which they held. They employed one Arthur D. Colgrove to promote the scheme. Colgrove knew complainant, Moore, to whom he applied for assistance. Defendant Livingstone and others owned land in North Detroit, where it was proposed to locate the works. The defendant Livingstone was applied to to donate land, and he, as well as other landowners there, was asked to donate money for the erection of a plant. Moore finally consented to assist in the organization of the company, and was the only man of financial responsibility connected with it, except Stanton and Brotherton, who claim to have become stockholders on the same conditions and representations as did Mr. Moore. Early in September, Mr. Colgrove presented to Mr. Moore an agreement for his signature, between him, as trustee, "and the undersigned, of the county of Wayne." The agreement had no signatures, but the undersigned were to be those who should afterwards subscribe to the bonus fund. The agreement reads as follows:

"*Whereas*, it is contemplated on the part of the said Charles W. Moore, trustee, to organize and establish a stock company in the sum of one hundred thousand dollars capital stock, for the purpose of establishing a factory for the manufacture and sale of elevators and all business incidental therewith;

"*And whereas*, it is understood that the said factory shall employ at least seventy-five workmen within ninety days after the said factory shall be completed and in operation, and will employ one hundred workmen within one year after the erection and completion of said factory;

"*And whereas,* the undersigned are solicitous and desirous that said factory be located on the acre and a half of land on the southeast corner of a certain forty acres of land owned by William Livingstone, Jr., and described as the west half of the east half of the northwest quarter of section nine, in the township of Hamtramck, in the county of Wayne and State of Michigan, said one acre and a half of land to be taken off the southeast quarter of said forty acres, and adjoining the railroad station at the village of North Detroit;

"*And whereas,* the undersigned are desirous that the said factory shall be located on the premises hereinbefore mentioned, for the reason that they are property owners and interested in the surrounding territory to said proposed site:

"*Now, therefore,* it is agreed between the undersigned, with Charles W. Moore, as trustee, that the said undersigned parties agree to donate the property hereinbefore mentioned as the site for said proposed factory to the said Charles W. Moore, trustee, and such other parties as shall be connected with him in the organization of said proposed stock company, and also to donate the amount set opposite their respective names, to be paid in installments, as hereinafter mentioned, the total amount of said subscriptions to equal the sum of fifteen thousand dollars.

"And the said undersigned agree to pay the sums set opposite their respective names as follows: Twenty-five per cent. of each subscription to be paid when the foundation in said factory is laid, and an additional thirty per cent. when said factory shall be roofed and inclosed, and an additional thirty per cent. when said factory shall be completed, and the balance of fifteen per cent. when said factory is in operation.

"And it is further agreed upon the part of the said Charles W. Moore, trustee, that the said company shall be organized and work shall be begun on said factory within ten days after said site is furnished to him and his associates, and the total amount of fifteen thousand dollars in addition thereto is subscribed.

"And it is further agreed by the said Charles W. Moore, trustee, that, before any of the said subscription shall be paid as aforesaid, he will furnish to the undersigned subscribers hereto a good and sufficient bond in the sum of twenty thousand dollars, conditioned for the carrying out of said agreement, and upon condition, further,

that said factory will be kept and remain in operation for the period of five years or more.

"And it is further understood and agreed that seventy-five thousand dollars of said proposed capital stock shall be subscribed within ten days from the time said bonus is subscribed.

"And this agreement faithfully to be kept and performed the parties hereto have hereunto set their hands and seals."

Moore signed the agreement, which was afterwards signed by defendant Livingstone for $2,000, and several others, the subscriptions amounting in all to $8,500. No further subscriptions could be obtained, and, at a meeting afterwards held, the organizers of the company agreed to accept the amount then subscribed, and proceed with the work. On October 11, 1895, the Universal Elevator Company was organized, with $100,000 capital. The corporators, and the number of shares held by them, as shown by the articles of association, were as follows:

| Name. | Shares. |
|---|---|
| Charles W. Moore | 2,500 |
| Marvin M. Stanton | 1,000 |
| Wilbur Brotherton | 675 |
| James N. Schoonmaker | 750 |
| Frank E. Schoonmaker, trustee | 700 |
| Frank E. Schoonmaker | 700 |

These articles were immediately filed in the office of the county clerk of Wayne county, and a few weeks afterwards in the office of the secretary of state. Immediately after the execution of the articles of association, and on the same date, a meeting of stockholders was held, and a board of directors elected, consisting of Moore, Stanton, Brotherton, and the two Schoonmakers. Moore was elected president. At the time of the organization, the following proposition from Schoonmaker Bros. & Co. was presented, and read by the secretary, as appears from the record:

"To the UNIVERSAL ELEVATOR CO., Detroit, Mich.

"*Gentlemen:* We, the undersigned, do hereby agree

to sell, transfer, and assign to the Universal Elevator Company our entire interest in all elevator patents, also our interest as agents for the Otto Gas and Gasoline Engines, also factory which we propose to erect, according to the plans submitted, and all adjoining property connected therewith, and our entire interest incidental with mechanical engineering, for a consideration according to the following estimated values:

| | |
|---|---|
| Elevator patents | $27,000 |
| Business of the Otto Gas-Engine Co. | 10,000 |
| Factory and property | 15,500 |
| Business incidental with mechanical engineering | 10,750 |
| Total | $63,250 |

"For the value of our business and properties we hereby agree to accept $63,250.00 worth of paid stock in the Universal Elevator Company."

This proposition was accepted, and a resolution adopted to carry it out, directing the officers of the corporation to issue to Schoonmaker Bros. & Co. $63,250 of paid-up stock upon receipt of assignment of their business as in such proposition specified. On the same day a certificate for 2,500 shares, the par value of which was $10, was issued to Mr. Moore. On the reverse side of the certificate was an assignment by Moore to Schoonmaker Bros. & Co. of the capital stock named in the certificate. This assignment recited that he (Moore) had bargained, sold, assigned, and transferred the stock to Schoonmaker Bros. & Co. It also contained the following:

"I do hereby constitute and appoint J. N. Schoonmaker my true and lawful attorney irrevocable, for me and in my name and stead, but to my use, to sell, assign, transfer, and set over all or any part of the said stock, and for that purpose to make and execute all necessary acts of assignment and transfer, and one or more persons to substitute with like full power."

All the other original stockholders made a like assignment of their certificates to Schoonmaker Bros. & Co. On the same day a certificate was issued to Schoonmaker Bros. & Co. to the effect that they "are the owners of

6,325 shares of the capital stock of the Universal Elevator Company." Schoonmaker Bros. & Co. on the same day indorsed upon the reverse side of this certificate that they had bargained, sold, assigned, and transferred to the following parties shares of the above stock as follows:

| | |
|---|---:|
| Frank E. Schoonmaker | 1,750 |
| James N. Schoonmaker | 1,750 |
| William H. Hultgren | 1,750 |
| Charles W. Moore | 500 |
| Wilbur Brotherton | 25 |
| Marvin M. Stanton | 25 |
| William R. Johnston | 25 |
| Arthur D. Colgrove | 500 |

After this, Moore purchased 500 shares of the stock for $100 from Hultgren. One thousand shares of the stock then and still do stand in the name of Mr. Moore. Not a dollar upon the capital stock was ever paid in in cash. No stock was ever sold, aside from that represented by the $63,250, as above set forth. There is no reliable evidence that the interests held by Schoonmaker Bros. & Co. in these patents were of real value. Moore made no investigation into the matter, but testified that afterwards he found them to be of very little value. The $10,000 put in as the business of the Otto Gas-Engine Company was nothing more than an agency held by Schoonmaker Bros. & Co., revocable at any time, and evidently was of no real value. The item of $15,500, called "factory and property," was represented by nothing except the promises as contained in the above agreement. The land had not been deeded, nor the bonus subscriptions paid. The item of $10,750, put in as "business incidental with mechanical engineering," had no tangible value, and was a valueless asset. Work was soon after commenced upon the building, and the building erected. Mr. Livingstone deeded the land to the company. Subscriptions to the bonus fund were paid in to the amount of about $4,000. On the 15th day of October, 1895, the elevator company executed a bond to the bonus subscribers in the sum of

$20,000, conditioned for the faithful performance of the agreement above recited. This was not such a bond as the agreement provided for, but nine of the subscribers indorsed upon it the following: "So far as I am concerned, I do not care to require any further assurance than the agreement and within bond." The money paid by these subscribers was used in the construction of the building, and as well other moneys advanced by Mr. Moore. The company could sell no stock, and debts were incurred which required payment. Mr. Moore, at the earnest solicitation of Mr. Schoonmaker, who was the general manager of the corporation, advanced money from time to time, and indorsed notes which he was compelled to pay, the amount of such indebtedness finally being $8,699.27.

On May 9, 1896, a resolution was adopted by the directors authorizing the execution of a note and mortgage for $6,000 for the purpose of raising necessary funds until stock could be sold. On June 3d this was rescinded, and the officers authorized and instructed the secretary to execute to Mr. Moore a warranty deed of the factory building and land to secure him for the money he had already raised for the company by indorsing their notes, and such further amount as he might be able to raise for them, and such accounts as he had guaranteed. A deed was executed, a straight warranty in form, but was not recorded, lest it should injure the credit of the company. On August 11th—the time appointed by the by-laws for a regular meeting—no quorum of the directors appeared, and an adjournment was had to the following day at 5 o'clock. Mr. Moore was at that time ill. Meanwhile Mr. Johnston had informed Mr. Moore of the meeting and of the adjournment, and Mr. Moore requested him to be present to see what was done. A quorum was obtained on the following day, and a resolution passed reciting that Mr. Moore had not made the advances which were to be made by him under the terms of the resolution of June 3d; that the parties donating the property and money de-

manded the return of the same; that the company was unable to perform and fulfill the conditions; that said company was indebted to the Otto Gas-Engine Company in the sum of $1,853.19; and authorizing a deed of the property to Mr. Livingstone to secure such indebtedness. The resolution also provided for the transfer of the property to another company, if one should be organized which should assume and pay the indebtedness of the Otto Gas-Engine Company, and should issue and deliver to Mr. Livingstone shares of its capital stock, fully paid and nonassessable, equal in value and amount to the property and money donated to the elevator company, in which event said Livingstone was to convey the property to the newly-organized company. Mr. Johnston immediately notified Mr. Moore of the action of the directors. Thereupon he hastened to the office of the register of deeds, and placed his deed upon record. On the following morning the deed of Mr. Livingstone was recorded, and one Thomas went and took possession of the building as the agent of Livingstone. Thereupon complainant filed this bill praying that his lien be declared a valid one, superior to that of the defendant Livingstone; that the property be sold, and applied upon the payment of the debts of said corporation, in accordance with the just rights of creditors; that the defendants be enjoined from interfering with said property; and for the appointment of a receiver. Mr. Moore, from the organization of the company down to the 12th of August, 1896, continued to act as the president and a director of the company, had attended the meetings of the board of directors, and his office was the office of the company.

Proofs were taken in open court. Complainant insists that he had no interest in the corporation, and that he went into it, as he himself expresses it, "only to assist these young men to get a business." He also claims that he told Mr. Livingstone that he had no interest in the concern. It is insisted by the defendants that they were ignorant of the relations existing between Mr. Moore and

the other corporators; that they had a right to rely upon
him, the only man financially responsible, as a *bona fide*
stockholder; that the organization was a fraud in law and
in fact; and that their rights are superior to those of Mr.
Moore. The court declined to pass upon the merits of the
controversy, saying:

" I do not think that the question of the rights of the
parties who have given money as a bonus to secure the
shops at the place located can be litigated in this suit, and
that the deed of Mr. Moore, while taken as stated, and for
security, cannot, in this cause, be declared valid against
the rights of those who paid the bonus."

He held that the only way the question could be reached
was through the court, under the direction of a receiver.
A decree was subsequently entered dismissing the bill of
complaint as to all the defendants except the elevator com-
pany, and the cross-bill of the defendant Livingstone, and
declaring that the deed of complainant should have prece-
dence as a mortgage lien from the date of recording the
same.

*S. S. Babcock,* for complainant.

*Brennan, Donnelly & Van De Mark* (*Selling & Hatch,*
of counsel), for appellants.

GRANT, C. J. (*after stating the facts*). 1. A large
part of the record is taken up with testimony relative to
the agreement between complainant and Schoonmaker
Bros. & Co. relative to the conditions under which com-
plainant became a stockholder in the corporation. It is
immaterial what those private arrangements were. Upon
this point the testimony is in sharp conflict. It is not
necessary to determine what rights Mr. Moore has against
his co-corporators and the defendant corporation. That
controversy concerns them alone, and is not before us.
The controversy now is between Mr. Moore and the bonus
givers, and the sole question is, What are the rights of Mr.
Moore, under his mortgage deed, as against those of the

defendant Livingstone, representing himself and his co-subscribers to the bonus fund?

2. It is essential to keep in mind a few facts in addition to those above stated:

(a) The organization of this corporation was a fraud in law, if not in fact. As to the Schoonmakers and Hultgren, it was a fraud in fact. The amount of property which they conveyed to the company, for which they received paid-up stock to the amount of over $63,000, was not worth any such sum. It was a gross and fraudulent over-valuation, and known by them at the time to be such.

(b) The bonus subscribers had no knowledge or notice of the fraudulent character of the organization. They relied upon Moore's connection with the corporation as a *bona fide* one. One of them, before subscribing, caused the articles of association, as filed in the county clerk's office, to be examined. We are not unmindful of the testimony of Mr. Moore that some time in 1896, prior to the execution of the deed by Livingstone to the corporation, he told Mr. Livingstone that he had no interest in the business. Moore at that time was a large creditor of the corporation. Mr. Schoonmaker had informed him that Mr. Livingstone refused to give the deed. Moore went to see Mr. Livingstone, and his version of the conversation is as follows:

"He refused to give the deed at first. I then said to him: 'Mr. Livingstone, I have no interest in their business at all whatever. I have not a piece of land within five miles of it; and if you gentlemen who own the land out there are not going to take any interest in the matter, I am going to get out, and I will go down to the office, and resign, this morning.'"

Just when this conversation took place does not appear, but it was evidently some time in the early part of 1896. According to Mr. Livingstone's version of this conversation, nothing was said to indicate to him that Mr. Moore was not a good-faith stockholder, and interested in the concern. Mr. Moore certainly was interested in getting

the deed from Livingstone to the corporation, and it was not very long after that the mortgage was made to him to secure his debt.

(*c*) Defendant Livingstone has contributed $1,700 in cash, and an acre and a half of land, worth at the time about $2,000.

(*d*) Moore, by his act in subscribing for the stock, in being a director and president, held himself out to the public and to creditors as a *bona fide* stockholder, and as liable for the amount of stock subscribed by him.

3. Moore's subscription contract was absolute upon its face, and, as between him and creditors who were uninformed of the situation, his liability thereunder cannot be changed by other contemporaneous agreements. Creditors are entitled to the full benefit of the stockholder's contract as he has made and published it in subscribing, executing, and filing his subscription to the stock of the corporation. 1 Cook, Stock, Stockh. & Corp. Law, §§ 137, 138; *Williams* v. *Benet*, 34 S. C. 112; *Downie* v. *White*, 12 Wis. 176 (78 Am. Dec. 731). Mr. Livingstone and the other bonus givers relied, as they had a right to, upon the agreement which he signed as trustee, and upon his membership in the corporation. His subscription was a trust fund, and those who dealt with the corporation with knowledge that he was a stockholder had a right to rely upon that fund as a *bona fide* one. As against them, he cannot defend by setting up that he became a mere accommodation, and not an actual, stockholder. As a director he became a trustee for the creditors, and no declaration of trust was necessary; but by his trust agreement he agreed with the bonus givers that $75,000 of the $100,000 of capital stock should be subscribed within 10 days from the time the bonus was subscribed. This was to be a *bona fide*, and not a mere paper, subscription. It was not contemplated that the building was to be built, machinery purchased, and a full plant erected with the money of the bonus givers, but that stockholders were to be furnished who would contribute to the necessary funds

for that purpose. . This was not done. Not a share of stock was subscribed or sold aside from that issued to the original subscribers as fully paid. Efforts were made to get others interested, and to sell them some of the stock. These efforts were ineffectual, and probably for the very good reason that no prudent man would invest in such an enterprise without an examination, and an examination would disclose to him its fraudulent character. There were in fact no *bona fide* subscriptions.

4. It is urged by complainant that a *bona fide* stockholder may become a *bona fide* creditor of a corporation. This is well established. *Sargent* v. *Webster*, 13 Metc. (Mass.) 497 (46 Am. Dec. 743); 1 Cook, Stock, Stockh. & Corp. Law, § 11. And he may secure his claim in the same manner as any other creditor. If complainant stood, in this litigation, as such a stockholder, he would be a secured creditor, whose security the law would protect. But he does not stand ' before the court as such a stockholder in his dealings with the bonus givers. As trustee under his agreement, and as a director, it became his duty to examine into the character and value of the property proposed to be turned over by Schoonmaker Bros. & Co., to determine its fair value, and to see that it was turned over to the company at such value. Instead, he made not even an inquiry, and for the reason, as he states, that he did not consider himself actually concerned in the corporation, but only consented to become a stockholder and director and president to accommodate his friends. An inquiry which he did afterwards make disclosed to him the worthlessness of most of the property. We need not enter into the question of the good faith of Mr. Moore in the transaction. If he trusted the Schoonmakers and Hultgren, believing they were honest and would do no wrong, he, and not those who trusted the corporation on the faith of Mr. Moore's open connection with it, must suffer. As between him and those dealing with the corporation in ignorance of his real connection with it, under his theory he cannot defend upon the ground that he

was a nominal party.    He does not stand before the court
in the light of a *bona fide* stockholder having a *bona fide*
claim against the company.

5. It is a universal rule that when corporators transfer
property to a corporation, for which they receive stock,
they must act in good faith, and put in the property at its
fair worth.    Creditors have the right to rely upon the
good faith of the stockholders, and to assume that they
have contributed to the stock subscribed in money or
money's worth, or are liable therefor.    This liability can-
not be evaded by the issuance of fully-paid stock when it
is not, or by putting in property grossly in excess of its
real value.    *Peninsular Savings Bank* v. *Black Flag
Stove-Polish Co.*, 105 Mich. 535; *Van Cleve* v. *Berkey*,
143 Mo. 109 (42 L. R. A. 593); *Wetherbee* v. *Baker*, 35
N. J. Eq. 501; *Coleman* v. *Howe*, 154 Ill. 458 (45 Am.
St. Rep. 133); *Osgood* v. *King*, 42 Iowa, 478; *Camden*
v. *Stuart*, 144 U. S. 104; *National Tube-Works Co.* v.
*Gilfillan*, 124 N. Y. 302.    Had Mr. Moore performed his
duty in examining into the value of this property, he un-
doubtedly would not have consented to becoming a party
to such a transaction.    As already stated, neither Living-
stone nor the others would have subscribed if Mr. Moore
had not been connected with the corporation, and, as they
believed, in a responsible manner.

6. Complainant's deed was only a mortgage, and the
corporation had the right to convey the property in pay-
ment of its debts, subject to his mortgage, if valid.    The
claim that his deed left nothing for the corporation to
convey cannot be sustained.

7. Both parties attack the validity of the deeds.    We
do not deem it necessary to discuss the objections raised.
Both deeds are in the nature of mortgages, and as such,
we think, were properly executed.

8. It is, however, urged against the claim of the bonus
givers that they did not comply with their contracts, and
pay the full amount of their subscriptions, although the
building was erected, machinery placed in it, some con-

tracts taken, and some men employed. Mr. Moore and his associates had not complied with their contract. He testified: "Practically, there never were any active operations at the factory, so far as I know." It was not contemplated that this building was to be built, and the machinery purchased, and the entire plant constructed upon the bonus subscriptions. It was understood and agreed that there were to be *bona fide* stockholders, liable upon their stock for whatever other funds should be necessary to complete the work. Instead of that, the bonus givers and Mr. Moore contributed all the funds that had been used. The company did not own the machinery that was placed in the building. All the machinery was obtained under a contract providing that the title remain in the vendor until paid for, and, shortly after this trouble began, the machinery was all taken under these contracts. For this condition of affairs Mr. Moore is responsible. He and his associates had broken their contract, and the bonus givers were under no obligation to perform on their part. At the time the deed to Livingstone was made, neither he nor the other bonus givers knew of the contemplated action, or knew the financial condition the company was in. It is probably true that one of the purposes of the Schoonmaker brothers and Hultgren in making the deed to Livingstone was to destroy Moore's security. Whether, in so doing, they acted in good faith, would depend upon whether their version of Moore's agreement with them was true. Even though it were intended to defraud Moore, and though Mr. Livingstone knew nothing about it at the time, still he would be justified in accepting the deed, and the trust thereby conveyed, to secure himself and the others.

9. Defendants' counsel rely upon Act No. 144, Pub. Acts 1895. Section 1 of that act makes it unlawful for any corporation to move, abandon, or discontinue in any way, to any material extent, any factory, etc., without repaying and restoring any and all moneys, bonds, lands, and other property which have been given or granted as a

consideration or inducement to its location or construction. Section 6 provides that, in case of the suspension of any such business on account of the financial failure of the corporation, bonus givers shall become and be creditors of such corporation to the amount contributed, having all the rights of other creditors. Clearly, the first section has no application. The sixth contemplates a failure. That is not this case. There had been no financial failure, because the organization had not fairly commenced the business for which it was organized. This case must, therefore, be disposed of on the general principles of equity applicable to cases of this character.

10. The organization of the corporation was a fraud upon the bonus givers, and complainant, however innocent of intended wrong, was a party to it. He did not perform his contract to organize a company with some responsibility attached to it, and with some tangible assets aside from the bonuses. It was his duty, under his contract, to do this for the protection of the bonus givers. Is it equitable now that he should escape the liability of a stockholder, and be protected in his debt, by taking the lands and bonuses contributed to pay it? The bonuses, including the land, amount to about $6,000. Under the theory of the complainant there is not now, and was not then, a stockholder of any financial ability, and he knew this. The land and the building thereon are all the valuable assets left. To them Mr. Livingstone, who was not interested in the corporation, has contributed about $3,700. Is it equitable to permit Mr. Moore to apply this property upon his debt? Is this such action as will satisfy the conscience of a court of equity? We think not. We think the lien of the bonus givers superior to that of Mr. Moore.

11. It is further insisted that the defendant Livingstone must first exhaust his claim against the corporation by suit, judgment, and execution returned *nulla bona.* We have not before us the case of an ordinary creditor enforcing his claim against a corporation. This is a case of defrauded bonus subscribers, who have received no con-

sideration whatever for the gifts made.   Parties resort to a court of equity to obtain relief when they have no adequate remedy in courts of law.   Technicalities cannot be invoked to defeat the ends of justice and of equity, when they form no insurmountable obstacle to relief.   Mr. Livingstone has a mortgage deed, the purpose of which was to secure him and the other bonus subscribers.   He had possession under that deed.   Mr. Moore resorts to a court of equity to foreclose his lien.   All the parties interested, both lien holders, the bonus subscribers through Mr. Livingstone, the corporation, and the property itself, are before the court.   We see no obstacle to granting relief.

The decree of the court below will be reversed, and decree entered in this court declaring the lien of Mr. Livingstone superior to that of Mr. Moore.   It is stated in the briefs that a receiver has already been appointed.   If so, he will be directed to take possession, and proceed to sell and dispose of all the property of the corporation, and out of the proceeds pay—*First*, the costs of such proceeding; *second*, the amounts advanced by the bonus givers, including the land given by Livingstone at its value when the company was organized; and, *third*, to pay Mr. Moore.   If no receiver has been appointed, the court below is directed to appoint one.   The case will be remanded to the court below to carry out the decree in accordance with this opinion.   Defendant Livingstone will recover the costs of this court.

The other Justices concurred.