## WOOD *v.* SLOMAN.

1. CORPORATIONS — LIMITED PARTNERSHIP ASSOCIATIONS — ORGANIZATION—CONTRIBUTIONS TO CAPITAL STOCK — PROPERTY—VALUATION—FRAUD.

Where the organizers of a limited partnership association, organized under chapter 160, 2 Comp. Laws, issued practically its entire capital stock in payment for a secret formula, one-half of the stock being immediately transferred to a trustee to be sold at a nominal price for the benefit of the association "in order to supply cash capital for the company and to enable it to carry on its operations," and the stock issued to others than the incorporators was issued upon original sub-

150 MICH.—12.

scriptions made directly to the association, the prices paid being from 20 to 50 per cent. of the par value, the contribution of the organizer transferring the formula cannot be said to have been taken at a valuation approved by the members subscribing, within the meaning of section 6079, 2 Comp. Laws, nor can the stock in the hands of such purchasers be considered fully paid and nonassessable and the stockholders exempt from liability to creditors of the association under section 6080, 2 Comp. Laws. CARPENTER and GRANT, JJ., dissenting.

2. SAME — UNPAID SUBSCRIPTIONS — ENFORCEMENT BY TRUSTEE IN BANKRUPTCY.

The trustee in bankruptcy of a limited partnership association can maintain a bill against stockholders to enforce payment of the difference between the sums paid to the association for stock and the par value of the stock, where the difference in value is an asset of the association.

Appeal from Wayne; Mandell, J. Submitted January 22, 1907. (Docket No. 74.) Decided December 10, 1907.

Bill by Ira L. Wood, trustee in bankruptcy of the Manna Cereal Company, Limited, against Morris H. Sloman, Theodore L. Backus, D. Fred Charlton, and others, to enforce a statutory liability for unpaid subscriptions, for an accounting, and for general relief. From an order overruling demurrers to the bill, defendants appeal. Affirmed.

*Albert B. Hall* (*Fred A. Baker*, of counsel), for complainant.

*Sloman & Sloman*, for defendants Sloman et al.

*Edward A. Barnes*, for defendant Backus et al.

*A. B. Eldredge* and *A. E. Miller*, for defendants Charlton et al.

MOORE, J. This is an appeal from orders overruling defendants' demurrers to complainant's bill of complaint. The questions involve a construction of sections 6079, 6080, 2 Comp. Laws, the last named of which provide that

under certain contingencies members of a partnership association may be liable to its creditors to the extent of the portions of their subscriptions in the capital of the association not then paid.    We insert sufficient of the bill of complaint for an understanding of the issues involved:

"STATE OF MICHIGAN,—In the Circuit Court for the County of Wayne, in Chancery.

"Your orator, Ira L. Wood, as trustee in bankruptcy for the Manna Cereal Co., files this bill against Morris H. Sloman" and upwards of 130 others whose names are given, and in the amended bill of complaint it is averred "being all of the persons owning stock of the Manna Cereal Company at the time of the filing of this bill," and respectfully shows unto the court:

"1. That the Manna Cereal Company is a partnership association, limited, organized under the laws of Michigan, being chapter 160, 2 Comp. Laws 1897.

"2. That it was organized on the 24th day of April, A. D. 1902, by Morris H. Sloman, G. L. Winckler and James H. Bayne, all of the city of Detroit, and State of Michigan, and the following statement was filed in the office of register of deeds of Wayne county on the said 24th day of April, 1902:

" 'The undersigned, desiring to form a partnership association for the purpose of conducting within the United States and Territories, the business of manufacturing an improved cereal breakfast food, with the principal office and place of business established and maintained at the city of Detroit, in the State of Michigan, by subscribing and contributing capital stock thereto, which capital stock shall alone be liable for the debts of such association, in accordance with and pursuant to Act No. 191 of the Public Acts of Michigan of 1877, as amended by Act No. 216 of the Public Acts of 1881, and Act No. 21 of the Public Acts of 1885, being chapter 160 of the Compiled Laws of Michigan of 1897, do hereby sign and acknowledge the following statement:

" ' *First.* The total amount of capital stock of said association is five hundred thousand dollars ($500,000), and all of which is paid in, in full, at the time of the execution of this statement, and consists:

" ' 1st. The formula for the manufacture of said im-

proved cereal breakfast food, which is held as a trade secret, and its value is understood and agreed to as four hundred and ninety-nine thousand, nine hundred and ninety-eight dollars ($499,998), and

"'2nd. Cash, two dollars ($2).

"'Making a total of five hundred thousand dollars ($500,000).

"''Second. The full names of the persons composing said association and the amount of capital subscribed for by each, is as follows:

|  |  |
|---|---|
| "'Morris H. Sloman, who contributes as part of said capital stock, property consisting of said formula at the agreed value of ___ | $499,998 00 |
| George L. Winckler, cash, one dollar___ | 1 00 |
| James H. Bayne, cash, one dollar___ | 1 00 |
| Total___ | $500,000 00 |

"'Third. The character of the business to be conducted is, the manufacture and sale of an improved cereal breakfast food, and the location at which the same is to be carried on is, the city of Detroit, county of Wayne, State of Michigan.' * * *

"3. That upon the organization of the said association a meeting of the members of the said association was held on the 1st day of May, 1902, at which meeting certain by-laws were adopted, among which by-laws, No. 3 reads as follows:

"'No certificate of shares in this association shall issue except to persons who have previously paid in full therefor.'

"The capital stock of the association was divided into 500,000 shares of the par value of one dollar ($1) each.

"By by-law No. 8 it was provided as follows:

"'Of the total shares of this association, 499,998 shares shall issue to Morris H. Sloman, in full for the formula of manufacture contributed by him to the capital stock of the association, and one share each to George L. Winckler and James H. Bayne respectively, they having paid in full therefor the par value thereof, and certificates for such shares shall issue accordingly.'

"4. That immediately after the adoption of the said by-laws, said Morris H. Sloman announced that he had disposed of certain shares allotted to him, and a stock-

holders' meeting was held, in which meeting the transferees of the said Morris H. Sloman's shares participated, new officers were ·elected, and a board of five managers was chosen.

"5. At this meeting the said Morris H. Sloman agreed to transfer for the benefit of the association, 249,998 shares of the stock held by him, which said shares were subsequently transferred by a deed in trust to F. C. Harvey for the benefit of the association; said shares to be sold for cash, for the use of the association, at a price not less than 20 cents per share, the remainder of the shares owned by Morris H. Sloman not to be sold or offered for sale until after the 249,998 shares were sold or responsibly subscribed for."

Said trust deed is then set out in full. Among other things it provides said Harvey is "to have and to hold the same in trust, however, upon the following uses and trusts, and not otherwise, to wit:

"*First.* To sell the said shares or any portion thereof, to purchasers for cash or its legal equivalent, at the best price obtainable therefor, but in no case shall any of said shares be sold for less than 20 cents per share.

"*Second.* To pay, or cause to be paid, into the treasury of said Manna Cereal Company, Limited, at once upon the receipt thereof, the entire proceeds of all such sales of stock, such proceeds to be held, used and disposed of by the said Manna Cereal Company, Limited, for its own sole and exclusive use, benefit and behoof.

"*Third.* To cause to be issued under the rules and by-laws of said company and its board of managers, regular and proper certificates of stock in said Manna Cereal Company, Limited, to the purchaser of said shares or any proportion or part thereof.

"And be it further known, that in consideration of the premises, and in order that the advantageous sale of said shares or any part thereof may not be obstructed or interfered with by any act of mine, I, the said Morris H. Sloman, do hereby promise, covenant, agree and undertake, that I shall not sell, or otherwise allow or permit the remaining portion of shares of said company, amounting to 250,000 shares of which I am the owner, to be sold or offered for sale until after the full number of 249,998 shares herein and hereby transferred, shall have been first sold or responsibly subscribed for.

"In witness whereof, I have hereunto signed my name and affixed my seal, at the city of Detroit, county of Wayne."

The bill states the trust was accepted by Mr. Harvey. Continuing it avers:

"6. In pursuance of this plan of organization, certificate No. 1 was drawn in favor of the said Morris H. Sloman for 499,998 shares, but this certificate was never issued, and still remains undetached in the stock book of the association, and bears upon its back the indorsement and assignment to F. C. Harvey, trustee, of 249,998 shares, T. C. Sherwood 50,000 shares, Morris H. Sloman 18 certificates aggregating 200,000 shares. Certificate No. 2 was issued to G. H. Winckler for one share. Certificate No. 3 was issued to James H. Bayne for one share. Certificate No. 4 was drawn in favor of F. C. Harvey, trustee, for 249,998 shares, but was never issued or detached from the stock book of the association.

"7. All stock subsequently issued to subscribers was issued as original stock, signed by the officers of the association, the stub only indicating that a transfer had been made from certificate No. 4, which as a matter of fact had never been issued or detached from the stock book.

"8. Different forms of blanks were used in subscribing for stock in said association, but all subscriptions were made directly to the Manna Cereal Co., Limited, and all stock issued upon such subscriptions were issued as original stock of the association.

"9. The board of managers of the said association agreed at various times to sell the stock of the association at different prices; some of the stock was sold for 20 cents on the dollar, some at 50 cents on the dollar; some of the contracts of subscriptions purported that the stock when issued should be considered as fully paid and nonassessable, while other contracts simply provided for a straight subscription at a price below the par value of the stock.

"10. Your orator shows unto the court that the above-named respondents all subscribed for stock in the said association, and agreed to pay different prices; but that none of the said respondents paid the par value of the said stock.

"11. Your orator shows that the said Morris H. Sloman sold a large number of shares of the stock of the said association assigned to him as aforesaid at a price below the

par value of the said stock, but the exact price received by the said Sloman for said stock is unknown to your orator.

"12. That on the eighth day of February, 1904, the said association was declared a bankrupt by the United States district court for the eastern district of Michigan; that your orator was appointed trustee in bankruptcy, and proceeded to collect the assets of the said bankrupt association, and apportion said assets among its creditors.

"13. Your orator shows that the said assets amounted to $4,480, and the debts proven before the commissioner in bankruptcy amounted to $23,883; that two dividends were declared of 5 per cent. and 5.6 per cent. each, and that the same have been paid to the said creditors.

"14. Your orator shows that there remains unpaid to the said creditors the sum of $21,304; that all of the assets of the said bankrupt association have been exhausted, except the unpaid subscriptions to the capital stock of said association.

"15. Your orator further shows unto the court that an attempt was made to organize an association with a capital stock of $500,000, with a cash capital of $2, and to raise money for the carrying on of the business of the association by transferring original stock to a trustee for the benefit of the association, and selling the same as treasury stock.

"16. Your orator charges the fact to be, that the scheme was conceived in fraud; that the stock was held by all the subscribers as original stock; that said stock was subscribed for as original stock, and was so issued by the said association.

"17. And your orator charges, the legal effect of such a scheme was to make the subscribers of such stock and their transferees liable for the debts of the said association, to the amount of the par value of the stock subscribed for.

"18. Your orator shows unto the court that the formula described in the said articles of association had very little, if any, value and that it was given a value of $499,998 in said articles in bad faith and fraudulently in an attempt to evade and defeat liability upon subscriptions to the capital stock of said association for the full amount of the par value thereof; that the certificate No. 1 in the name of Morris H. Sloman for 499,998 shares of the capital stock of said association was never issued to him and was

not intended to be issued; that said Morris H. Sloman on the making out of said certificate, immediately assigned 249,998 shares to Fred C. Harvey as trustee for the association, and the same became and was original stock in said association, and subscribers to the capital stock of said association were given certificates from the stock so held by said Fred C. Harvey as trustee, as stock issued by the association, and each and every said subscriber became and from thenceforth has been and still is liable to the association for the full amount of his respective subscription at the par value of said stock. That the 250,000 shares of stock remaining in the name of Morris H. Sloman was put in his name and remained in his name without any consideration whatever and the same never became a valid subscription to said capital stock, except so far as subscriptions to the capital stock of said association were obtained, and certificates were issued to subscribers by transfers of stock from the 250,000 shares so placed and held in the name of Morris H. Sloman."

The bill then prays for an assessment and has a prayer for general relief.

The various defendants are represented by upwards of 30 solicitors who have filed demurrers in behalf of their clients, assigning different reasons for the demurrers. All of these reasons are embraced in the demurrer filed in behalf of defendant Theodore L. Backus, et al. The reasons assigned, which will sufficiently present the questions involved, are as follows:

"2. Because it affirmatively appears from said bill of complaint that the Manna Cereal Company, Limited, is a partnership association and that its entire capital stock was fully paid at the time of the organization thereof in such manner as to bind the said partnership association itself, and therefore no person could be entitled to compel the payment of additional money from the subscribers or stockholders thereof as for unpaid stock subscriptions, except such as have been fraudulently deceived or misled in fact and to their injury, and it does not appear that the complainant, or all, or any of the persons in whose behalf said bill is filed, have been wrongfully misled or deceived by or through the action of the original incorporators and subscribers to said capital stock or these de-

fendants in such manner as to give him or them any rights in the premises against said original subscribers or these defendants, which the partnership association itself did not possess.  *  *  *

"4. Because it affirmatively appears from the said bill of complaint that public notice of exactly what property constituted the entire capital stock of said partnership association was given in the manner provided by law, by which notice all of the parties in whose behalf this bill is filed are bound, which notice explicitly set forth without evasion or anything calculated to mislead, exactly what property was taken in said capital stock and the valuation at which the said property was taken by said partnership association.

"5. Because the said bill of complaint does not contain any allegations connecting these defendants or any or either of them with any fraud in the manner in which the capital stock of said partnership association was issued as full paid or charging them with any knowledge or notice of the actual consideration therefor, other than that which it appears from the said bill of complaint was had by the parties in whose behalf this bill is filed.

"6. Because assuming that the allegations of said bill of complaint established a liability on the part of these defendants as for unpaid stock subscriptions, it does not appear from the said bill of complaint that all responsible persons similarly liable and within the reach of process of this court at the time said bill of complaint was filed have been made parties to said cause.

"7. Because by reason of the facts affirmatively appearing upon the bill of complaint in this cause particularly referred to in the foregoing ground of demurrer numbered two, such claims for additional contribution as might exist could not be assets in the hands of a trustee in bankruptcy for general distribution (because they could exist only in favor of such creditors as have been deceived and defrauded) and cannot be enforced by him.

"8. Because it affirmatively appears from the said bill of complaint that the stock alleged to have been subscribed for and purchased by said defendants was at the time of such alleged subscription and purchase 'treasury' stock, the same having been previously issued as full paid stock and returned to the treasury, and as such said partnership association was lawfully entitled to dispose of the same as full paid stock for its fair value regardless of its par value,

and it does not appear from the said bill of complaint that such 'treasury' stock was sold to said defendants for less than its fair value at the time of such sale."

It is urged that the bill sets forth nothing giving rise to a contract liability on the part of the defendants. It is also said the allegations of the bill do not set forth a case of liability upon any equitable principles. It is contended that as the subscriptions were made and the property conveyed as provided in the articles of association there can be no liability. It is also said that where the valuation was agreed upon by the incorporators and no deception was practiced upon them, creditors in general have no better rights than the corporation itself would have. It is urged, we quote from the brief:

"But the principles upon which liability is established in the case of the issuance of the capital stock of a corporation for property taken at an excessive valuation are entirely inapplicable to this case, because of the fundamental differences in the provisions which the statutes and the common law have developed for the protection of creditors and others dealing with corporations and the provisions to accomplish the same purpose in the statutes under which this concern was organized."

In support of this contention the solicitor cites *Mc-Bryan* v. *Elevator Co.*, 130 Mich., at page 121; they then quote section 6079, 2 Comp. Laws, and say:

"To any one familiar with the principles upon which liability is established against corporation subscribers the noticeable features of this statute are the provisions in express terms authorizing the organizers under it to contribute property at any valuation agreed upon by all of them, and the requirement that in such case a schedule be filed showing exactly what it is that is taken at such a valuation. The plain intent of this statute is that the protection of parties dealing with the association shall not as in the case of corporations be in any representations as to how much in value has been contributed by the organizers, but in the information the certificate must furnish as to what the contribution actually consists of. In the case of corporations where the creditor is given no knowledge

of the actual property the correctness of the valuation is all important. But under this act, as intending creditors are to be given the means of making their own valuations, the valuations of the organizers become unimportant excepting as furnishing a measure between themselves of their respective shares. The important thing for others is the description.

"The provision for recording is clearly intended to give notice to everybody concerned of the matter recorded. Where parties have acted under this statute and have fully complied with the provisions intended for the protection of others by truthfully reciting exactly what the property is which constitutes the capital, to hold that they, or purchasers from them of the capital stock so obtained, shall nevertheless be liable upon proof that their valuation is excessive, would nullify the plain provision of the statute authorizing them to put their own valuation on it provided they give the requisite information."

In support of this argument the cases of *Dieterle* v. *Enamel Co.*, 143 Mich. 416, *Staver & Abbott Manfg. Co.* v. *Blake*, 111 Mich. 282 (38 L. R. A. 798), and certain cases from Pennsylvania are cited. We do not reach the same conclusions from reading these cases as does counsel. In the *Staver & Abbott Case*, supra, the court declined to follow to the fullest extent the Pennsylvania cases. It is well however to look at those cases for they throw light upon two features of this case, *first*, Was the description of the property sufficient? and *second*, Must the incorporators act in good faith in putting a value upon the property?

In *Maloney* v. *Bruce*, 94 Pa. 249, the articles of association fix the amount of capital at $15,000 "and recites that the whole amount of the capital had been paid in by the assets and property of Martin Maloney, one of the members, at a valuation approved by all the members." Then follows what purports to be a list of the property contributed in lieu of cash, the first item being a "contract with the Pennsylvania Gaslight Company at a valuation of $2,500," with no information what the contract was, after which comes merchandise under a general de-

scription, together with "furniture, fixtures and all goods, tools and chattels now on the premises, 209 Lackawanna avenue, Scranton city, valuation $12,500."

In disposing of the case the court said:

"This is not the kind of schedule contemplated by the act of 1876. The description is too general to enable any one to form a correct estimate of the extent of the property, and a lumping valuation renders it equally difficult to judge of values. The property contributed was intended as the equivalent of a cash capital, and the plain object of the provision in the act of 1876 requiring a schedule was to enable creditors to ascertain precisely of what the property consisted and to judge of its value. If parties seek to have all the advantages of a partnership and yet limit their liability as to creditors, they must comply strictly with the act. Where property has not been contributed, scheduled and valued as the act of 1876 directs, there is no payment of the capital."

In *Vanhorn* v. *Corcoran*, 127 Pa. 255 (4 L. R. A. 386), decided in 1889, one of the items of the schedule was as follows: "Paid in merchandise, lumber, book accounts and bills receivable transferred to this association, $21,609.18." As a matter of fact it appeared that the amount $21,609.18 represented the difference between the estimated assets and the estimated liabilities of a firm which merged into the association. The court in disposing of the case said:

"It will be noticed that the act gives a wide latitude as to the kind of property that may be contributed as capital. At the same time, it is very evident that it contemplates a real actual capital in cash, or in property available for the business of the company and the payment of its debts. It was never intended that the property contributed as capital should be moonshine, wild lands, or water lots. If the business be merchandising, a stock of goods and the store house in which they are contained would be legitimate; if the business be mining, a mine with its machinery and improvements would be appropriate; and if manufacturing, the factory building, with its machinery and the stock, manufactured and unmanufactured, would be in the direct line of its business, and

therefore a proper and available contribution to capital. The point of these remarks will appear later. * * *

"The description in this case is even more vague than in *Maloney* v. *Bruce*. It consists of 'merchandise, lumber, book accounts, and bills receivable.' A creditor looking at this description could not form any estimate of its quantity, character, or value. For all practical purposes it might as well have been omitted. If the property had been properly scheduled, an estimate of its value might have been made approximating the truth. As an illustration, if the general and indefinite word 'lumber' had been followed by the words 'consisting of 100,000 feet of No. 1 yellow pine flooring,' almost any business man could have formed a fair idea of its value, or he could have ascertained it from any one engaged in the lumber business. * * *

"Their allegation in the certificate that they had contributed $21,609.18 in property was inaccurate, and came dangerously near being a false statement, though I do not think it was so intended. Had the certificate set forth that their contribution consisted of their interest in a firm subject to the payment of its debts, it would have conformed to the truth, but it would not have been a compliance with the act of 1876. That act contemplates such contributions as shall be available to aid the business and pay the creditors of the limited partnership."

Apply the language of these two cases to the case at bar and do we find a sufficient description of property so that an inquiring creditor could form an intelligent estimate of the value of the property contributed? Suppose, distrusting his own judgment, he calls in an expert manufacturer of breakfast foods, and asks him to put a value upon property described as " a formula for the manufacture of said improved cereal breakfast food, which is held as a trade secret," is he likely to get a definite and intelligent answer? We cannot imagine a description of property more indefinite than this.

Another Pennsylvania case is illustrative. It is the case of *Rehfuss* v. *Moore*, 134 Pa. 462 (7 L. R. A. 663). The defendants had formed a limited partnership association under the name of the Automatic Overseaming But-

ton Hole Machine Company, Limited.   Three thousand and thirty dollars was contributed in cash.   Certain patent rights for button-hole machines, which were described in detail, were put in at a valuation of $496,970. It appeared that the creditors, when they became such, had actual knowledge of all the facts relating to the patents and bearing upon their value.   It is held that patent rights are such property as may be contributed to the capital of a limited partnership association.   After mentioning some of the earlier cases the opinion proceeds:

"But where, as here, the statement is in due form, and contains all the essential requirements of the statute, but the valuation is alleged to be unconscionable, and inserted in the statement without any proper consideration of the inherent or intrinsic worth of the property contributed, the question is one of good faith.   All property contributed under the act of 1876 is to go into the capital 'at the valuation to be approved by all the members subscribing to the capital,' and the subscribers would not be justified, perhaps, in fixing a grossly fictitious and fraudulent valuation to mislead and defraud creditors.   But if their estimate is made honestly and in good faith, it must be accepted, although mistaken, and even grossly excessive. Their motives must be considered as of the time when the valuation was made; it will not do to condemn their estimate of the property because it afterwards proved worthless, and the enterprise resulted in a disastrous failure. In this case there is no evidence of fraud.   The members of the association seem to have believed these patents to have been of extremely great value.   One-fifth interest in the original invention cost $10,000; the remaining four-fifths were held by Mintzer and Banks, and the entire patent was thus contributed to the association."

Then after giving a history of the patents the court proceeds:

"There is practically nothing to support a charge of fraud.   The testimony clearly shows that this enterprise was undertaken in good faith, and that the members had the utmost confidence in its final success.   They paid in the cash capital, and contributed as much more in aid of the enterprise.   The whole trouble was, that, although the invention was valuable in mechanical conception, and

was a pioneer invention in its line, yet others, who were active in the same direction, relieved its imperfections, and reaped the reward. The plaintiffs were not deceived. They knew the nature and character of the several contributions made to the association, for these contributions were certified upon the record according to the fact, and they had, besides, actual, personal, and intimate knowledge of the resources of the company. We are of opinion that this was a good-faith transaction, and the judgment should be affirmed."

We think the language fairly construed means that cases may arise where the good faith of the incorporators in placing a value upon the property contributed is an important factor.

Counsel call attention to another case. We quote from the brief:

"Then came the important case of *Cock* v. *Bailey*, 146 Pa. 328, the final one in the series in which the law in Pennsylvania was developed and established, and which is especially important for us. In this case the articles of association showed that the company was organized with a capital stock of $500,000, subscribed as follows: 'James M. Bailey, $100,000,' etc., etc.; that 'each of the subscriptions was to be paid by the transfer of an undivided interest in the property described in the schedule attached.' These schedules described the property in great detail, but gave no separate valuations and set out stipulations that the conveyances were subject to certain liens and that a sufficient amount of the capital stock was to be retained by the association at the par value of the same to cover these liens. Liability was claimed because of the lumping valuations, but the court held that they had substantially complied with the requirements of the law, and should not be held personally liable. Paxson, Chief Justice, after referring to the requirements of the statute, says:

"'The object of this, as was said in *Maloney* v. *Bruce*, 94 Pa. 249, is to enable creditors to ascertain precisely of what the property consisted, and to judge of its value. The main point is the description. That should be sufficiently accurate to identify it. The valuation is a minor matter. The company can put it in at its own value, so that it be agreed upon. There is nothing in the act to restrict the amount of the valuation. If it is excessive, the creditor

can decline to give the company credit; while, if the description is accurate, he can only be misled by his want of prudence. But, if the description be so defective or inaccurate that the creditor may be misled, he has no means of forming an accurate judgment.'"

There are one or two sentences quoted which perhaps justify the conclusion of counsel; we think however from a careful examination of the case that the court did not understand it was laying down a new rule of law. The property contributed was real estate. It was described by metes and bounds. The court did not intimate that it intended to overrule or modify its previous decisions. On the contrary it cited with approval *Hill, Keiser & Co.* v. *Stetler*, 127 Pa. 145. See, also, the case of *First Nat. Bank of Danville* v. *Creveling*, 177 Pa. 270. Our own statute has been before the court several times. In *Rouse, Hazard &· Co.* v. *Wayne Circuit Judge*, 104 Mich. 234, it was held the provisions of the act were constitutional, and that an execution may issue against any of the members of the association to the extent of the unpaid portions of their subscriptions respectively.

In *Rouse, Hazard & Co.* v. *Cycle Co.*, 111 Mich. 251, (38 L. R. A. 794), it was held that these associations are governed by the law of corporations rather than by the law of limited partnerships. It was also held that the good faith of a transaction whereby the stockholders of a limited partnership association which had become insolvent gave their promissory notes for the unpaid portions of their subscriptions to the capital stock, which notes were immediately turned over to· the principal creditor, who advanced money to pay certain outstanding indebtedness, and arranged to continue the business, is a question for the jury.

In *Dieterle* v. *Enamel Co.*, 143 Mich. 416, reference was made to the case of *Young* v. *Iron Co.*, 65 Mich. 111, and a quotation made therefrom. The court then said:

" In the case at bar, however, there was nothing to indicate to creditors of the defendant company that no cash was paid in, and that the assets consisted wholly of an in-

terest in an insolvent company, and in a secret formula which none of the shareholders except Rice had ever seen, and which he knew to be a fraud. However much the original shareholders may have acted in good faith as to the creditors, what was done was as to them a fraud. The case is within *Moore* v. *Elevator Co.*, 122 Mich. 48; *Mc-Bryan* v. *Elevator Co.*, 130 Mich. 111. The solvent original incorporators should be required to pay their subscriptions in full if necessary to satisfy the complainant creditor."

If the facts are as stated in the bill of complaint, we think the creditors are entitled to relief against the original subscribers to the extent of their unpaid portions of stock respectively. *Rouse, Hazard & Co.* v. *Cycle Co.*, 111 Mich. 251 (38 L. R. A. 794), and 1 Cook on Corporations (5th Ed.), § 108, and cases cited in note, are authority for the maintenance of the suit by the receiver.

The decree is affirmed, and defendants are given 30 days in which to answer:

OSTRANDER, J. I agree that the bill should be answered. If the facts set out in the bill reasonably supported the inference that the contribution of Morris H. Sloman to the capital stock was taken at a valuation approved by the members subscribing, I should be inclined to agree that mere excessive valuation of the contribution was not unlawful and is not to be regarded as fraudulent with respect to interests represented by complainant. But I think no such inference is warranted and that the facts set out in the bill and admitted by the demurrers to be true justify but one conclusion, which is that the sole purpose of fixing a value for the formula was to enable the promoters to sell, at a nominal price, stock represented to be full paid. It will not do to say that the entire capital stock of such an association can be made fully paid and nonassessable by the mere observance of a form—by force of a declaration of the three original associates—the plan in fact being to sell the stock, for the association, for cash,

for a fraction of its par value, "in order to supply cash capital for the said company and to enable it to carry on its operations." It is charged in the bill that stock issued to others than the incorporators was issued upon original subscriptions made directly to the association, the prices paid for stock ranging from 20 to 50 cents per share.

The point that the trustee in bankruptcy may not, in this proceeding, enforce payment of the difference between the sums paid to the association for stock and the par value of the stock, is ruled against appellants by *Rouse, Hazard & Co.* v. *Wayne Circuit Judge*, 104 Mich. 234; *Same* v. *Cycle Co.*, 111 Mich. 251 (38 L. R. A. 794), if this difference in value is, as it is charged as being, an asset of the association.

McAlvay, C. J., and Blair, Montgomery, Hooker, and Moore, JJ., concurred with Ostrander, J.

Carpenter, J. The facts in this case are stated in the opinion of Justice Moore. The issue requires us to construe the following part of section 6079, 2 Comp. Laws (relating to the organization of partnership associations):

"Contributions to the capital stock may be made in real or personal estate, at a valuation to be approved by all the members subscribing to the capital of such association; but where property has been contributed as part of the capital, a schedule containing the names of the parties so contributing, with a description and valuation of the property so contributed, shall be inserted in such statement; and any amendment of said statement shall be made only in like manner; which said statement and amendments shall be recorded in the office of the register of deeds," (now the secretary of State and county clerk).

Does the foregoing section give the members therein mentioned the right to place any valuation they choose upon the property contributed by them to the capital of such association? I maintain that it does. I understand complainant concedes that the members may place upon such property an excessive valuation, but he insists that they cannot place upon it a valuation which they know to

be excessive. In other words, he insists that in fixing that valuation they must act in good faith. The State of Pennsylvania has a similar law, and this law was construed in *Rehfuss* v. *Moore*, 134 Pa. 462 (7 L. R. A. 663). There it was held that the members might place upon the property an "unconscionable" valuation, "inserted without any proper consideration of the inherent or intrinsic value of the property contributed." It is true that the court said: "The subscribers would not be justified, perhaps, in fixing a grossly fictitious and fraudulent valuation," but this was merely dictum, for in that case the subscribers had acted in good faith in valuing the property. In a later case, *Cock* v. *Bailey*, 146 Pa. 328, the court said:

"The main point is the description. That should be sufficiently accurate to identify it. The valuation is a minor matter. The company can put it in at its own value, so that it be agreed upon. There is nothing in the act to restrict the amount of the valuation. If it is excessive, the creditor can decline to give the company credit; while, if the description is accurate, he can only be misled by his own want of prudence."

The above language, in my judgment, is a correct statement of the law; and it is not at variance with any prior adjudicated case in the State of Pennsylvania.

*Maloney* v. *Bruce*, 94 Pa. 249, and *Vanhorn* v. *Corcoran*, 127 Pa. 255 (4 L. R. A. 386), referred to by my Brother MOORE, are not in point. Each of these relate to a question entirely different from that under discussion, viz., the question of the proper description of the property contributed. The statute, in my judgment, gives the members of a partnership association the right to finally determine the valuation of the property contributed as capital stock. It neither says nor indicates that the members must put upon that property a fair valuation or even what they regard as a fair valuation. They may place upon it any valuation they choose. No valuation approved by them is excessive, because they have a

right to determine that valuation. Creditors have no right to say that any such valuation deceived them, for it does not purport to be the true valuation. Property contributed "at a valuation approved by all the members" is lawfully contributed.

I think, too, that this is the construction upon which the legal profession and business men advised by them have acted in forming partnership associations.

Proceeding upon the assumption that property might "be contributed at a valuation approved by all the members," it will, I think, be found that they have often—and with no intention of defrauding creditors—placed upon such property a valuation in excess of what they believed to be its true value. An adjudication that fraud shall be or may be inferred from such action will, in my judgment, lead to disastrous consequences and do great injustice. The circumstance that such members did not intend to defraud creditors when they excessively valued the property contributed will be—if not entirely immaterial—practically unimportant; for their intention to defraud creditors will be inferred, if, as complainant contends, the law prohibits them from placing upon the property a valuation known by them to be excessive.

Justice OSTRANDER, while conceding—as I understand his opinion—the general proposition that the valuation "approved by all the members" is not open to review, maintains that it is otherwise in a case like that under consideration where "the sole purpose of fixing a value for the formula was to enable the promoters to sell at a nominal price stock represented to be fully paid." I am unable to assent to this qualification. It suggests an exception which is not found in the statute. I think it is opposed to a proper construction of the statute. That, in my judgment, as already indicated, gives the members of the association "the right to place any valuation they choose upon the property contributed by them to the capital of such association."

I do not discover any charge in complainant's bill that

the secret formula (the property contributed) was not sufficiently described in the articles of association. If that point is made, I do not think it well taken. I do not see how the description could have been any more particular and definite without disclosing the secret of the formula. To disclose this would have destroyed its value.

The contention that the formula is not sufficiently described is then in effect a contention that a secret formula can constitute no part of the capital of the association. For if it could, its members clearly had a right to contribute such formula as a part of said capital. The association was lawfully organized for " the manufacture and sale of an improved cereal breakfast food." What reason is there for saying that it could not own a secret formula for manufacturing said food ? I can see none. I submit that there is none. I think the order overruling the demurrer should be reversed, and the demurrer sustained.

GRANT, J., concurred with CARPENTER, J.