## DURAND v. BROWN.

### In re TILDEN SAW & MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. November 8, 1916.)

No. 2832.

**1. CORPORATIONS ⬤�незнач230—STOCK—PAYMENT OF SUBSCRIPTIONS.**

Stock issued as paid-up and nonassessable cannot be assessed, in the absence of fraud.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 877; Dec. Dig. ⬤⟹230.]

**2. CORPORATIONS ⬤⟹232(2)—STOCK SUBSCRIPTION—PAYMENT.**

Under Pub. Acts Mich. 1903, No. 232, § 2, providing that capital stock subscribed may be paid in, either in cash or in other property, real or personal, and in view of Pub. Acts Mich. 1907, No. 146. § 2, limiting the property so appropriable to such as can be sold and transferred by the corporation, and as shall be subject to levy and sale on execution, a secret process, though intangible, was, prior to the latter act, property which was appropriable for the payment of capital stock of a corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 883; Dec. Dig. ⬤⟹232(2).]

**3. PROPERTY ⬤⟹2—WHAT IS.**

Secret processes and formulas are "property," and rights in them are recognized and entitled to protection as property rights.

[Ed. Note.—For other cases, see Property, Cent. Dig. § 2; Dec. Dig. ⬤⟹2.

For other definitions, see Words and Phrases, First and Second Series, Property.]

**4. CORPORATIONS ⬤⟹269(3)—STOCK SUBSCRIPTIONS—PAYMENT.**

Where it was contended that stock of a corporation was not paid in, evidence *held* to show that a secret process, listed as property and given in payment of the stock, was delivered to the corporation, and that it had the benefit thereof.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 887, 888, 1154–1159, 2277; Dec. Dig. ⬤⟹269(3).]

**5. GOOD WILL ⬤⟹5—"PROPERTY RIGHT"—TRANSFER.**

Good will is a "property right" which can be conveyed with the business to which it is incident.

[Ed. Note.—For other cases, see Good Will, Cent. Dig. § 2; Dec. Dig. ⬤⟹5.

For other definitions, see Words and Phrases, First and Second Series, Property Rights.]

**6. CORPORATIONS ⬤⟹232(1)—STOCKHOLDERS—TRANSFEREES.**

A transferee, with full knowledge that stock, though purporting to be fully paid in, is not actually paid for, is liable to corporate creditors for the amount unpaid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 879, 880, 987; Dec. Dig. ⬤⟹232(1).]

**7. CORPORATIONS ⬤⟹76—STOCK SUBSCRIPTIONS—PAYMENT THEREOF.**

Money paid toward the purchase of corporate stock cannot be converted into a loan to the detriment of other interested parties.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 197–209, 213–218; Dec. Dig. ⬤⟹76.]

**8. CORPORATIONS ⬤⟹232(3)—STOCK SUBSCRIPTION—LIABILITY FOR.**

Where corporate stock was, on the formation of a corporation, delivered in return for property, and it was contended that a creditor, who

once owned part of the stock, was liable because the stock had not been fully paid for, the property contributed having been overvalued, *held*, inequitable to charge against such stock more of the deficiency than the ratio it bears to the whole stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 884; Dec. Dig. 232(3).]

9. CORPORATIONS 479—STOCK SUBSCRIPTION—PAYMENT—UNPAID SUBSCRIPTION.

Members of a partnership engaged in manufacturing and leasing butchers' saws, being in the need of working capital, organized a corporation and received practically the entire stock, paying therefor by transferring to corporation property, patents, and a secret process for manufacturing saw blades; such process being valued at a large sum of money. Thereupon members of the firm entered into an agreement to transfer one-half of the stock to a trustee, on his paying to the corporation a sum of money equal to one-half of the par value of the stock; the agreement providing that dividends thereon should be paid to the corporation until they aggregated the other half of the par value of the stock. The trustee was given an option to withdraw from the corporation and demand back his advances, repayment of the same to be secured. The trustee, after making most of the advances provided, gave notice of intention to withdraw, and the appellee who had succeeded to the trustee's rights, was given a mortgage to secure the amounts due. The mortgage was of record when credit was advanced to the corporation. The formal requisites of Pub. Acts Mich. 1903, No. 232, providing for payment of corporate stock in property, were complied with. *Held* that, though the members of the firm obviously did not deem the secret formula to have the present market value listed, yet, as they in good faith expected the corporation to prosper, and that, when developed, the net corporate assets contributed would, as a whole, be worth the amount at which they were taken, it would be inequitable, under all the circumstances presented, to deny to appellee the enforcement of his mortgage as against the other creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1869, 1872–1874; Dec. Dig. 479.]

10. CORPORATIONS 479—STOCK SUBSCRIPTIONS—RIGHT OF CREDITORS.

Though ordinarily unpaid stock subscriptions inure to the benefit of future as well as existing creditors, under the facts of this case, creditors giving credit with the mortgage on file are not entitled to complain that the stock held by appellee's predecessor had not been fully paid for.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1869, 1872–1874; Dec. Dig. 479.]

11. BANKRUPTCY 262(3)—JURISDICTION—DISPOSITION OF FUNDS.

Where property of a bankrupt corporation subject to a mortgage was sold free from the mortgage, the parties agreeing to abide by the final determination of the court as to ownership, the court had jurisdiction to award the fund to the mortgagee, notwithstanding it was contended that the mortgagee, by reason of his predecessor's ownership of corporate stock which it was asserted had not been fully paid in, was not entitled to enforce the same.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 365; Dec. Dig. 262(3).]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

In the matter of the bankruptcy of the Tilden Saw & Manufacturing Company. The claim of Cullen Brown was contested by Harvey S. Durand, as trustee in bankruptcy. From a judgment of the Dis-

trict Court, reversing the order of the referee, and awarding a fund to claimant, the trustee appeals. Affirmed.

H. B. Graves, of Detroit, Mich., for appellant.

Charles Wright, Jr., and J. W. Beaumont, both of Detroit, Mich., for appellee.

Before KNAPPEN and DENISON, Circuit Judges, and SESSIONS, District Judge.

KNAPPEN, Circuit Judge. Appellee is the owner of the unpaid balance (about $5,175) of the bankrupt's bonded indebtedness, secured by mortgage on its plant and other property. The mortgaged property was sold by the trustee in bankruptcy, under the order of the bankruptcy court, and by agreement between the interested parties the balance of the mortgage debt was paid over to a third person (who was in fact the trustee in bankruptcy) as trustee, to abide the final determination of the court as to right and ownership. The trustee and appellee each presented claims to the fund. The referee found appellee indebted to the bankrupt on account of certain subscriptions to its capital stock, in amount sufficient to wipe out the mortgage debt, and awarded the fund to the trustee in bankruptcy for distribution among creditors. The District Judge reversed the referee and awarded the fund to appellee; hence this appeal.

The case, so far as now material, is this: George M. and William E. Tilden were members of a copartnership engaged at Detroit in manufacturing and leasing butchers' saws. At least one of the Tildens had been in that business 22 years. They were in need of working capital. As a result of negotiations with appellee and one MacCallum, a corporation called the Tilden Saw Company was formed November 5, 1904, under the laws of Michigan, for the manufacture and sale of butchers' saws and the leasing of the same, and for other purposes. The capital stock was divided into 600 shares, of $100 each, of which one of the Tildens subscribed for 300 shares, the other 299 shares, one Crandall taking the remaining share, presumably to furnish the required number of incorporators. According to the articles of association, the stock was fully paid for in property, according to these valuations: The shop equipment of the late copartnership, together with saw frames and blades under lease, or manufactured, or in process of manufacture, as well as materials for the same, together with a horse, wagon, and harness, at amounts aggregating $9,500; two United States patents to the Tildens for improvements in saws at a valuation of $30,000; and this further item:

"The secret process for the manufacture of saw blades devised by George M. and William E. Tilden and heretofore used in the business of Tilden Bros. & Noble and duly assigned in writing to said Tilden Saw Company, $21,900."

These various items totaled $61,400 and were taken subject to an indebtedness of $1,400, which the corporation assumed. A written contract between the Tildens and MacCallum, trustee, bearing date the 15th day of the same month of November (and ratified on the same

date by the corporate directors and stockholders), recited the organization of the company with full-paid capital stock of $60,000, and the Tildens' ownership of the larger part of it; their wish to procure additional capital for "promoting the interests and business" of the corporation; the desire of MacCallum, as trustee for himself and others, to investigate the business, and his willingness to furnish "additional cash" upon the conditions thereafter named—and provided for the sale and transfer to MacCallum, as trustee, of 300 shares, or one-half the capital stock; for the election as directors of MacCallum, appellee, George Tilden, and William Tilden, to hold respectively the offices of president, treasurer, secretary, and vice president; for the payment by the trustee of $8,000 in three installments on or before three months, to be used in discharging certain debts of the corporation, the cost of its organization, and current expenses in the manufacture of about 5,000 frames and 40,000 saw blades; for the further payment of $3,000 on or before 90 days after the receipt of a certain shipment of saw frame and blade steel, and $4,000 more, in two items, within 60 days later, all of the payments to be made to the Tildens and by them paid over to the corporation as its property; for the turning over of the 300 shares of stock mentioned (except a qualifying share each to MacCallum and appellee) to a third party in escrow, to pass to the trustee on full payment of the $15,000 stated—the dividends, however, on one-half of that amount (until aggregating $15,000) to go to the corporation, and only afterwards to go to the trustee, provision being made for meanwhile protecting the rights of the corporation in that half of the stock. The trustee was given express power to withdraw at any time after the making of the first three payments (aggregating $8,000), if dissatisfied with the business of the corporation; or if, at the time of the last payment, there should not have been placed upon the market and in the hands of butchers 5,000 frames with accompanying blades, the trustee could postpone his decision to withdraw until such amount of frames and blades should be in good faith so placed, with the right, in the event of such decision, to sever connection with the corporation, cancel the stock purchase, and be relieved from further payments, whereupon the corporation should repay to the trustee the entire amount so invested by him at the rate of $600 per month, with interest, the repayment to be secured by bill of sale of 5,000 saw frames and 40,000 blades, etc.—the trustee to contemporaneously give the corporation contract authority to lease such property in the usual course of its business. During the period of experimentation the trustee and appellee, as well as the two Tildens, were to be employed by the corporation at salaries of $15 per week each, George Tilden meanwhile to have charge (subject to appellee's supervision, control and possession) of the financial and business management, as well as of manufacturing. The corporate articles of association and the contract between the Tildens and the trustee were in effect parts of one transaction.

The contract was proceeded with, the trustee and his beneficiaries advancing under it $13,600 (or $14,100), which was paid to the Tildens and by them turned over to the corporation, on whose books it

was carried as "surplus account." Appellee acted in effect as general manager during the probationary period. About March 1, 1906, Mr. Beaumont (who had meanwhile succeeded MacCallum as trustee) gave notice of withdrawal from the corporation under the terms of the written contract, the stock so contingently purchased was reassigned to the Tildens, and on March 1, 1906, the Saw Company gave to Beaumont, as trustee, a bill of sale to secure the repayment of the sums so advanced according to the original agreement, except that the times of payment were slightly postponed—the trustee thereupon giving the corporation the lease provided for by the contract. Payments were made to appellee (who had succeeded to the rights of the trustee and his cobeneficiaries) until June 1, 1909, at which time $10,000 remained unpaid, whereupon the trust mortgage in question was given (securing a $10,000 bond issue delivered) covering all the corporation's assets. At the time of the adjudication in bankruptcy, more than three years later (viz., October 31, 1912), about $5,000 and interest remained unpaid.

[1-3] The trustee in bankruptcy contends that the capital stock of the corporation was unpaid for to the extent of the valuation put in the articles of association upon the so-called "secret process" (the valuation of the other items of property contributed not being directly challenged), and that appellee's relations to the transaction were such as to make him liable for its full payment. The statute in force when the corporation was organized (P. A. Mich. 1903, Act 232, § 2) provided that the capital stock subscribed may be paid either in cash or in other property, real or personal, with the proviso that:

"Where payment is made otherwise than in cash there shall be included in the articles an itemized description of the property in which such payment is made, with the valuation at which each item is taken, which valuation shall be conclusive in the absence of actual fraud."

So far as form goes the statute was unquestionably complied with. It is the settled rule in Michigan that stock issued as paid-up and non-assessable cannot be assessed in the absence of fraud. Young v. Erie Iron Co., 65 Mich. 111, 31 N. W. 814; Graves v. Brooks, 117 Mich. 424, 426, 75 N. W. 932.

The trustee in bankruptcy contends, first, that the so-called secret process was not property capable under the statute of being appropriated in payment of capital stock; and, second, that it was fraudulently overvalued. We entertain no doubt that the secret process, as described in the articles of association, was appropriable under the statute to the payment of capital stock. The fact that it was intangible does not make it any the less "property," for the then existing statute contains no limitation of appropriable property, such as found in the later statute of 1907.[1]

---

[1] P. A. Mich. 1907, Act No. 146, § 2; 4 Howell's Mich. Stat. (2d Ed.) § 9533, limits the property so appropriable to such as "can be sold and transferred by the corporation, and as shall be subject to levy and sale on execution, or other process issued out of any court having competent jurisdiction, for the satisfaction of any judgment or decree against such corporation."

We find nothing to the contrary of this view in the decision in Savings Bank v. Stove Polish Co., 105 Mich. 535, 539, 63 N. W. 514, which does not in terms declare that no intangible property having actual value can be taken by the corporation at such value in payment for its capital stock—the holding being only that the "gift for influence" there involved was "not a tangible asset, such as the law contemplates as a part of the capital stock of a corporation." However, the statute of 1885 there involved (P. A. Mich. 1885, Act No. 232) contained no express provision for payment for capital stock in property.

Secret processes and formulas are property, and rights in them are by the Supreme Court of Michigan recognized as entitled to protection as property rights. O. & W. Thum Co. v. Tloczynski, 114 Mich. 149, 72 N. W. 140, 38 L. R. A. 200, 68 Am. St. Rep. 469; Grand Rapids Wood Finishing Co. v. Hatt, 152 Mich. 132, 115 N. W. 714. It is of course true that a purely fictitious item of property would not satisfy the statute, as, for example, the formula involved in Wood v. Sloman, 150 Mich. 177, 193, 194, 114 N. W. 317, whose valuation was held merely a form to enable a sale of stock for a fraction of its proper value, or the gift for influence involved in Savings Bank v. Stove Polish Co., supra, or the fictitious schedule condemned in Nichols v. Buell, 157 Mich. 609, 615, 122 N. W. 217.

[4-9] The trustee in bankruptcy contends, however, that the so-called secret process was not for the manufacture of saw blades, but simply for "the method or manner of running or operating the business," and so not property within the meaning of the statute. This proposition and the contention of fraudulent overvaluation may be considered together. The referee agreed with the trustee's contention as to the nature of the secret process, and held that the stock issued for it had not been paid for, because the process had not been written out and was not disclosed by the Tildens to the corporation, nor "turned over to it in such manner as to be of any value to it, if it had any value." The question of fraudulent overvaluation was not otherwise passed upon. The District Court expressly held that the charge of fraudulent overvaluation of assets contributed (apparently treated by the court as a whole) was not sustained.

We see no merit in the suggestion that the process, whatever it was, was not turned over to the corporation. True, it was not written out, but it does not appear to have been a mere formula; there was testimony that the whole process was in effect turned over to the corporation (it was expressly included in the bill of sale from the Tildens to the corporation as "a certain secret process known to us and used by us in the manufacture of saw blades"), and that, had the Tildens left the company, the latter could have continued the business. So far as the process related to mechanical work, it would have to be "illustrated and shown." The corporation must have had whatever benefit there was in the process, for both Tildens remained with the corporation throughout the eight years intervening between the corporate organization and the bankruptcy.

There was testimony that the secret process was "just our knowledge of how to conduct the saw business," "simply our knowledge of the business, which of course we kept secret to ourselves"; that "nothing

but the system was secret." But there was also testimony, not only that it was "simply the knowledge of how to set and file saws"; that it was "a system of manufacturing blades and sharpening them"; but that it consisted in the "handling of the machines as well as the method of getting the work out, and somewhat the method of placing it on the market also." Brown testified that the secret process "referred to certain filing machines that they [the Tildens] did not care to place patents upon."

There was also testimony that the $21,900 valuation was put in by agreement between the Tildens, MacCallum, and appellee, to enable the Tildens to get "our half of the stock," and tending to show that no attempt was made to place a specific valuation upon the secret process, except to adopt such amount as would bring the valuation up to $60,000.

Considering all the testimony, we think the parties understood that the property furnished by the Tildens had no such present market value as was put upon it in the articles, and that it had no intrinsic value to that amount, unless for use in connection with a going, reorganized and profitable business. We think, however, that the Tildens believed that, with the cash to be advanced by MacCallum and his associates for developing the business, it would be successful to the extent of earning net dividends upon the full capitalization of $60,000, and thus that when so developed the net corporate assets contributed would, as a whole, be worth that amount. The fact that one-fourth of the stock was to be entirely paid for by the application of such dividends tends strongly to evidence such belief. It is not unnatural that the Tildens, having such belief and expectation, but lacking the capital or the ability to obtain it by ordinary commercial loan, should be willing to put in one-half of their outfit, including patents, processes, and all incidents of their business, including good will, so far as it existed (and good will is a property right which can be conveyed with the business to which it is incident, Prame v. Ferrell [C. C. A. 6] 166 Fed. 702, 92 C. C. A. 374), against the cash contributed by MacCallum and Brown into the treasury of the corporation for the purposes stated.

We also think that MacCallum and Brown *expected* that, given such working capital and the proposed co-operation, the business would be profitable to the extent stated, and would pay reasonable dividends upon the full capitalization of $60,000; otherwise, they could hope to get, for a very long period of years at least, earnings (scant at that) upon but one-fourth of the stock, for which they would pay par. With dividends at 6 per cent. it would take nearly 17 years to pay for the other one-fourth. The fact that in the corporate reports for 1907 and later years patents and formulas were carried at much less than the aggregate valuations put in the articles of association upon patents and "secret process" does not strongly tend to show fraud in the original valuations. In 1906 one-half the total original stock had been turned into the treasury.

But MacCallum and his associates were furnishing money for a business new to them, and they did not *know* that this expectation would be realized. It was natural that during such period of experimentation they should retain, for their protection against disappointment, the option of determining their ultimate status, whether as creditors or stock-

holders. The fact, if it be a fact, that they refrained from participat-
ing in the original incorporation in order to avoid the question of stock-
holding liability, does not strongly make against the existence of such
expectation, especially in view of the probationary nature of their re-
lation. We should hesitate to say that a fraudulent overvaluation of the
assets, as a whole, contributed by the Tildens, was made out, especially
having in mind the fact that all of the permissible capital stock was
placed at the outset, and that there is nothing to indicate that either of
the four parties concerned had any intention of selling their holdings
in whole or in part. In fact, although other stock issues were made
during the operating life of the corporation, there is no evidence that
any of its stock, old or new, was ever sold at less than par.

But whether or not, under other circumstances, and as against cred-
itors otherwise related, the valuation in question would be deemed
fraudulent, we think it would be inequitable to so hold, and to deny to
appellee the repayment of his advances, under the circumstances pre-
sented and in favor of the beneficiaries here concerned. True, it is
the general rule that a transferee with full notice that stock, though
purporting to be fully paid for, is not really paid for, is liable to cor-
porate creditors for unpaid subscriptions. It is also the general rule
that "money paid towards the purchase of stock cannot be converted
into a loan to the detriment of other interested parties." Clark v. Clark
Mach. Co., 151 Mich. 421, 423, 424, 115 N. W. 416, 418; Allen v.
Commercial Bank (C. C. A. 6) 191 Fed. 97, 99, 111 C. C. A. 577, and
cases cited. But the facts of this case, we think, distinguish it from
the cases last cited, and from all the other decisions chiefly relied on by
appellant.

Although the contract took the form of a sale with option to convert
into a loan, we think, upon a review of all the evidence, oral and writ-
ten, that in equitable contemplation the dominant nature of appellee's
primary relation to the corporation should be regarded as that of a
loaner of money, with option of stock purchase, rather than that of a
purchaser endeavoring to turn the transaction into a loan. The rela-
tions of MacCallum and appellee as officers and stockholders, not only
were not greatly different than frequently given creditors, but were rea-
sonably necessary to the experimental operation required to enable an
intelligent exercise of the option.

Appellee is not attempting to get anything but his advances and rea-
sonable interest. The corporation has apparently had the actual benefit
of every dollar of his advances, and has been able to operate about
eight years, presumably, at least in large measure, as a result initially
of the advances made by appellee and his associates. The corporation
is shown to have been solvent when appellee retired, and apparently
made a little profit for a time thereafter. It is fairly inferable from
the testimony of one of the Tildens that the later losses were largely
due to going into experiments and the manufacturing of "side lines."
The witness also says there was no need of going into bankruptcy—
"there was just a quarrel between my father and brother and the pre-
ferred stockholders."

Moreover, as already said, the stock returned by appellee and his associates to the Tildens was not kept by them, but was turned into the corporation treasury. Later new issues of stock, both common and preferred, were made, and such sales of new and old stock have been had that the corporation has in effect received from the $30,000 stock in question at least one-half the $21,900 alleged overvaluation of property contributed by the Tildens. It would, we think, be inequitable to charge against this stock more than the ratio it bears to the whole stock. Clark v. Clark Mach. Co., supra, 151 Mich. at page 421, 115 N. W. 416.

No creditors could reasonably have given credit, actually or constructively, on the supposition that the stock in question was not paid for. The stock was issued in the name of the Tildens as paid for; the corporate records showed the making of the contract and the subsequent acts and conveyances, including not only the bill of sale from the Tildens to the corporation, but the bill of sale to secure the repayment of advances, given by the corporation to the trustee, upon the exercise of the option to receive back the money—this bill of sale being entered at large upon the corporate records upon March 9, 1906. The contract itself (a copy of which was also attached to the bill of sale last referred to) was, on July 26, 1905, recorded in full in the record of articles of association kept by the county clerk. The fact of the making of the bond issue of 1909, and the trust mortgage securing it, were entered upon the corporate records May 19, 1909, the mortgage was duly recorded in August following, and an item of secured indebtedness (apparently represented by the debt to appellee, although not so designated) is shown in the report of the corporation for each year from 1907 to 1912, both inclusive. The existing creditors became such since May 1, 1911. The alleged overvaluation was thus not "to the detriment of other interested parties."

[10] Although it is the general rule that unpaid stock subscriptions inure to the benefit of future as well as existing creditors (Clark v. Clark Mach. Co., supra, 151 Mich. at page 424, 115 N. W. 416), we think the facts of this case bring it within the rule that creditors giving credit with a mortgage on file in the proper office are not entitled to complain (Clark v. Clark Mach. Co., supra, 151 Mich. at page 421, 115 N. W. 416).

[11] We have no doubt of the jurisdiction of the District Court, under the consent submission, to make the order complained of. Whether, in case a contrary result had been reached, it would have had jurisdiction, except by bill in equity, to decree and enforce assessment for unpaid subscriptions, is a question not calling for decision.

The judgment of the District Court should be affirmed.